*In re* COMMITMENT OF SHAWN LOURASH (The People of the State of Illinois, Petitioner-Appellee, v. Shawn Lourash, Respondent-Appellant).

Second District   No. 2—03—0026

Opinion filed April 13, 2004.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford, and Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Linda D. Woloshin and Mary A. Fleming, Assistant Attorneys General, of counsel), for the People.

JUSTICE CALLUM delivered the opinion of the court:

Respondent, Shawn Lourash, appeals a judgment finding that he is a sexually violent person and ordering him committed to a Department of Human Services (DHS) treatment facility for six months or until further order of the court. On appeal, respondent argues that the

trial court erred in denying his motion for a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) on the admissibility of scientific evidence that the State's expert witnesses used in forming their opinions. We hold that although the trial court erred in denying respondent a *Frye* hearing, the error was harmless. Therefore, we affirm.

On December 14, 1999, the State filed a petition under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 1998)), alleging the following facts. On January 28, 1991, respondent was adjudicated delinquent, based on his commission of aggravated criminal sexual assault, and placed in the youth division of the Department of Corrections (DOC). On September 19, 1998, in case No. 96—CF—2793, respondent was sentenced to six years in the DOC for an adult conviction of predatory criminal sexual assault.[1] He was scheduled to start mandatory supervised release (parole) on December 17, 1999. Dr. Agnes Jonas had diagnosed respondent with several mental disorders, including "Pedophilia, Sexually Attracted to Males and Females, Exclusive Type" and dysthymic disorder, not otherwise specified (NOS). Respondent was dangerous to others because his mental disorders made it substantially probable that he would engage in sexual violence again.

The petition continued as follows. In the juvenile case, respondent committed two offenses against neighborhood children. He inserted his penis into the anus of a five-year-old boy and rubbed the vagina of a two-year-old girl against his groin. In September 1996, nine months after he was released from prison, respondent committed the offense in case No. 93—CF—2793 by inserting his finger into the vagina and anus of his eight-year-old niece. Respondent admitted that he also placed his penis into her mouth, vagina, and anus. Respondent had been receiving mental health services since he was age four, when he set his mother's bed on fire. He was hospitalized for psychiatric

---

[1]The petition attached a copy of the "certification of conviction" from case No. 96—CF—2793. The certification states that on March 9, 1998, respondent was convicted of "the offense of Aggravated Criminal Sexual Abust [*sic*]." Dr. Agnes Jonas's report states that respondent was convicted of "Predatory Criminal Sexual Assault." However, respondent's motion to dismiss the petition and the State's response to that motion both recite that in case No. 96—CF—2793, respondent was convicted of "aggravated criminal sexual assault" (for which he received six years' imprisonment) and "aggravated criminal sexual abuse" (for which he received four years' probation to be served consecutively to the prison sentence). Nothing in the record appears to resolve these discrepancies, but they are not important for purposes of this appeal.

problems in March 1990 and August 1990, the second time after committing the sexual offenses in the juvenile case. In October 1990, respondent was hospitalized after being found unfit to stand trial. Respondent admitted to having sexually deviant fantasies involving children and to becoming sexually aroused upon seeing children on television.

The petition attached Dr. Jonas's report, which was later admitted at trial. In the report, Dr. Jonas summarized the results of her evaluation, which was based on an interview with respondent and a review of his prison "master file" and medical files. Dr. Jonas stated that respondent, who was born June 4, 1976, had experienced an extremely unstable childhood. His parents divorced when he was three. At age four, respondent lit his mother's bed on fire and said that he wanted both of them to die. In 1990, he assaulted his mother in court. Respondent's parents fought over custody of him, and he regularly moved and changed schools. He was physically abused repeatedly and, at age 13, was sexually abused by a neighbor. Although respondent and his mother had acted violently toward one another, he felt extremely attached to her.

Dr. Jonas's report also summarized the investigative reports pertaining to the acts that led to the 1991 juvenile adjudication and the 1998 conviction. Dr. Jonas concluded that respondent "is mostly in denial or at the very best inconsistent" in taking responsibility for his acts. He told Dr. Jonas that once or twice a week, he had sexual dreams about children. It was only after having these dreams that respondent took his medicine. If respondent saw a television show with small children, he became sexually aroused and turned off the set. When respondent was in prison in 1998, he violated regulations by engaging a cell mate in mutual masturbation at least 3 times in 30 days.

Dr. Jonas noted that respondent was committed to the juvenile division of the DOC on January 28, 1991, was paroled "sometime in 1993," and "returned" as a parole violator about eight months later after he went "AWOL" and failed to attend outpatient therapy. (Respondent told Dr. Jonas that he had attended therapy regularly.) Respondent was again paroled "around 10/20/94" and discharged from parole on January 2, 1996, but he reoffended in September 1996.

Dr. Jonas stated that at age four, respondent was diagnosed as "manic-depressive, schizophrenic, and ADHD" and placed on Ritalin. He had since been prescribed Tegretol, Tofranil, and Dexedrine. Tests performed in 1990 placed respondent's intelligence in the "low average" range. In October 1998, respondent was diagnosed with alcohol dependence and a history of major depressive disorder and placed on

Sinequan. Later, he was taken off Sinequan and placed on Zoloft. Respondent told Dr. Jonas that he was not taking his Zoloft regularly but did so only after becoming sexually aroused by his fantasies or television.

While incarcerated in 1998, respondent apparently expressed some interest in sex-offender therapy. However, he did not participate in any such treatment after September 1998, when he was transferred from Danville to Joliet after receiving a "sexual misconduct ticket." Since October 20, 1998, when he was transferred to the Dixon Correctional Center, respondent had not participated in any therapy even though it was available to "all inmates with sexual offenses."

Dr. Jonas's report explained her diagnoses. Respondent met the criteria for pedophilia because of his recurring and intense sexual fantasies, urges, or behaviors involving prepubescent children; his desires as early as age nine "to have sex with children"; the three sexual offenses of which he had been found guilty; two other documented cases, which involved victims aged three and five; and his ongoing sexual fantasies about children. Respondent "admit[ted] that he will have to keep busy, day and night, to avoid sexually abusing and assaulting children once on parole." Respondent had dysthymic disorder in that he was chronically depressed. He suffered from personality disorder in that he failed to conform to social norms, tried to deceive others, manipulated children into sexual activity, acted aggressively on impulse, and lacked remorse for his antisocial behavior.

Dr. Jonas's report concluded to a reasonable degree of psychological certainty that it was substantially probable that respondent would commit another act of sexual violence. She based her conclusion in part on the mental disorders she had diagnosed. Additionally, respondent had several characteristics that the 1996 Hanson-Bussiere "meta-analysis" found are associated with a high risk of recidivism. These included prior sexual offenses; sexually deviant fantasies; incomplete and limited treatment; a negative relationship with his mother; the fact that most of his victims were not family members; the fact that at least one victim was male; respondent's age (under 25); the early onset of his offenses; and respondent's never having been married. Furthermore, Dr. Jonas noted that respondent's score on the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), an actuarial instrument, placed him at "high risk" of reoffending.

The case proceeded to a probable cause hearing. Dr. Jonas testified consistently with her report. She also testified that when she interviewed respondent, he denied that he had committed the juvenile offenses. Jonas noted that according to social history and clinical reports, respondent frequently refuses to talk about these subjects,

sometimes feigning unconsciousness. Dr. Jonas had learned that after respondent was paroled from the DOC's youth division, he was supposed to have outpatient sex-offender treatment but violated his parole by failing to attend treatment regularly. Later, when he was incarcerated in the adult facility in Dixon, respondent was never in any therapy.

After the trial court found probable cause and ordered respondent committed to the custody of the DHS, the matter went to trial. The parties stipulated to the admission of Dr. Jonas's report and her testimony at the probable cause hearing. The State then called Dr. Barry Leavitt, a licensed clinical psychologist and an expert in the evaluation and treatment of sex offenders. Dr. Leavitt testified as follows. After the probable cause finding, Leavitt was assigned to evaluate respondent in order to determine whether respondent had mental disorders that predisposed him toward future sexual violence and whether there was a substantial probability that respondent would again commit a sexually violent offense. Leavitt tested respondent and reviewed respondent's DOC files, treatment records, psychological evaluations, and police or investigative reports. Leavitt prepared a report in January 2000 and updates in April 2001 and March 2002. These reports were admitted into evidence.

Initially, Leavitt had diagnosed respondent with "pedophilia, sexually attracted to both male and female children, non-exclusive type"; depressive disorder, NOS; and personality disorder, NOS, with antisocial features. After reviewing more comprehensive tests taken at "the treatment protection detention facility program," Leavitt added diagnoses of alcohol abuse and recurrent major depression.

Leavitt had reviewed respondent's juvenile and criminal cases. In addition to summarizing the details of these offenses, Leavitt testified that respondent admitted that he had sexual intercourse with his niece in 1993, when she was three, and that respondent told Dr. Jonas that he had put his penis inside his niece's mouth or vagina at least one other time.

In the DOC's youth division, respondent participated briefly in sex-offender therapy, but Leavitt found no evidence that respondent had had any other such treatment while in prison. While in prison, respondent never received sustained sex-offender-specific treatment. Respondent had received mental health treatment during his three hospitalizations in 1990. After the first two hospitalizations, respondent did not adhere to his aftercare plan and was soon rehospitalized. After he was committed to the DHS in this case, respondent completed some of the tests in the "comprehensive entry to treatment evaluation" but refused to follow through with the

"psychosexual aspect of that testing process." Also, respondent participated in some ancillary therapy but avoided the core treatment program for sex offenders.

Leavitt gave respondent three psychological tests. The first test, for intelligence, placed respondent in the low-average to average range. The results of the two personality tests were not credible because respondent reported more symptoms than were realistically possible. From the three tests, Leavitt learned that respondent could understand the proceedings against him but tended not to "respond reliably and truthfully to material presented to him." These results accorded with respondent's history of inconsistency in taking responsibility for his actions.

Leavitt explained how he diagnosed respondent's mental disorders and the relationship of these disorders to the probability that respondent would reoffend. The diagnosis of pedophilia was supported by respondent's long history of sexually deviant urges; his admission to Dr. Jonas in 1999 that he was still struggling with these urges; and his three sex offenses. The diagnosis of major depressive disorder was based on respondent's symptomology from his youth into his adulthood and the fact that medical intervention had not stabilized his condition. Also, respondent had not consistently stayed on his medication. The diagnosis of alcohol abuse rested on the extent of respondent's drinking and how it impaired his social functioning. Finally, respondent was diagnosed with antisocial personality disorder because he had a "chronic personality disturbance" that affected how he viewed himself and others and because of his impulsiveness, deceitfulness, and disregard for others' rights.

Dr. Leavitt did not rely solely on his diagnoses to determine whether respondent was predisposed to sexual violence. He also considered respondent's "offense history," the persistence of respondent's deviant interests and behavior, and respondent's continued display of poor impulse control. To help gauge respondent's risk of recidivism, Dr. Leavitt used an actuarial screening instrument, the Static 99. This test gives the subject a positive or negative score for each of 10 static (i.e., essentially permanent) characteristics, with the overall positive score determining which risk category he is in. Research has shown that the 10 factors are significantly correlated with the risk of recidivism. Respondent scored six, which placed him in the highest-risk category.

Dr. Leavitt also relied on the Hansen-Bussiere meta-analysis, a study of the best "studies in the field" of sexual-violence recidivism. Leavitt learned that respondent had "numerous risk factors" that the meta-analysis had identified. These factors included that several of his

victims were outside his family; that at least one victim was male; and that he had numerous prior offenses. The 1998 "Hanson and Harris" study reinforced Leavitt's concern with the static risk factors he had seen in respondent's case and also identified dynamic factors of concern, including respondent's deviant sexual interest, anger problem, intimacy problems, and tendency to resist personal change.

Dr. Leavitt believed to a reasonable degree of psychological certainty that respondent had a "substantial probability of reoffending." His opinion was based on "a combination of the clinical evaluative process and the risk analysis procedure, which would involve consideration of the specific risk instrument results, looking at individual risk factors" and recognizing that there were "no particular mitigating factors" in that respondent had not completed any "course of study, offender specific treatment specifically." Leavitt noted that the completion of therapy is "the one factor that shows most promise" of reducing the risk of reoffending.

Asked why respondent met the legal definition of a sexually violent person, Leavitt explained that respondent's mental disorders predisposed him to sexual violence in the future. He added, "In addition to that, the risk analysis evaluation indicates that he currently continues to possess a substantial probability of reoffending. " Respondent's attorney asked Leavitt specifically, "if you had not performed any of those actuarial instruments [sic] and utilized those in your evaluation, would your professional opinion be changed at all this afternoon?" Leavitt answered, "No, it would not."

The trial court found that the State had proved beyond a reasonable doubt that respondent was a sexually violent person. After the trial court denied respondent's motion for a new trial and ordered him committed to the DHS, respondent timely appealed.

■ On appeal, respondent argues that the trial court erred in denying him a *Frye* hearing where he could contest the admissibility of the evidence that was based on actuarial instruments that Drs. Jonas and Leavitt used to measure respondent's risk of recidivism. According to respondent, any testimony predicated on the use of the Hansen-Bussiere "meta-analysis," the MnSOST-R, and the Static 99 was scientific evidence and thus admissible only if the methodology on which it was based was " 'sufficiently established to have gained general acceptance in the particular field in which it belong[ed].' " *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 77 (2002), quoting *Frye*, 293 F. at 1014. Although respondent did not raise this issue in his motion for a new trial, we disregard the waiver rule because the alleged error may have denied respondent a fair trial when his personal liberty was at stake. See *In re Detention of Traynoff*, 338 Ill. App. 3d 949, 963 (2003).

■ We agree with respondent that the trial court erred in denying his motion for a *Frye* hearing. As the State concedes, we decided the same issue in *People v. Taylor*, 335 Ill. App. 3d 965 (2002), and *Traynoff*, where the admissibility of an expert opinion based in part on the MnSOST-R and the Static 99 was at issue. In *Taylor*, we elected not to follow other jurisdictions that had ruled that the results of these actuarial instruments were not scientific evidence. We concluded that the actuarial instruments, which supplemented and went beyond the experts' "clinical judgment, training, and expertise," were a type of scientific methodology that the State had to show had gained general acceptance in the relevant scientific community (*Taylor*, 335 Ill. App. 3d at 977) and that the State had not met its burden (*Taylor*, 335 Ill. App. 3d at 978). However, we acknowledged that in a future case, the State might be able to prove that the actuarial instruments meet the *Frye* criteria. *Taylor*, 335 Ill. App. 3d at 980. In *Traynoff*, adhering to our holding in *Taylor*, we held that the State had not satisfied its burden to prove that the MnSOST-R, the Static 99, and another actuarial instrument at issue met the *Frye* criteria. *Traynoff*, 338 Ill. App. 3d at 963-65; see also *In re Detention of Hargett*, 338 Ill. App. 3d 669, 675 (3d Dist. 2003) (following *Taylor*).

Here, the State asks us to reconsider *Taylor* and *Traynoff* and to hold that the actuarial instruments at issue in this case are not subject to the *Frye* test. We recognize that the Fourth District has rejected our reasoning in *Taylor*. See *In re Commitment of Stevens*, 345 Ill. App. 3d 1050 (2004); *In re Detention of Erbe*, 344 Ill. App. 3d 350 (2003). However, based on *stare decisis* and the reasoning in *Taylor*, we decline to disturb our earlier holdings. Therefore, the trial court erred in refusing to grant respondent a *Frye* hearing. Because there was no *Frye* hearing at all, the State did not meet its burden to prove that the actuarial instruments that its experts used had achieved general acceptance in the scientific community.

Although the trial court erred in refusing to hold a *Frye* hearing, we must still decide whether this error warrants reversal of the judgment finding respondent a sexually violent person. We conclude that the error was harmless beyond a reasonable doubt. Even had respondent prevailed at a *Frye* hearing, the result of the proceeding would have been the same. The use of the actuarial tests was not crucial to the experts' conclusions that respondent was substantially likely to reoffend, and the evidence that was not based on disputed scientific methodologies amply supports that conclusion.

Dr. Leavitt and Dr. Jonas both diagnosed respondent with pedophilia (among other mental disorders) and testified that to a reasonable degree of psychological certainty, they believed that

respondent was substantially likely to reoffend. No expert testified otherwise. Dr. Leavitt stated explicitly (on questioning by respondent's counsel) that his opinion would have been the same had he not relied on the actuarial instruments at all. The record makes this claim more than plausible. Even absent the actuarial test results, exceedingly strong evidence (to which Dr. Leavitt gave great weight) supported Dr. Leavitt's expert opinion. Most notable is respondent's history of sexual violence. When the State filed its petition, respondent was only 23 years old and had spent several of those years in the DOC. Nonetheless, he had already been adjudicated guilty of three criminal sexual assaults against children and had admitted to having sexually assaulted his niece two other times. In prison, respondent repeatedly engaged in forbidden sexual conduct with a cell mate.

Moreover, both experts could draw on more than respondent's numerous prior acts of sexual violence (and other illegal sexual acts). Respondent told Dr. Jonas that he suffered from long-standing, recurrent, and intense sexual dreams and fantasies relating to children, and he admitted that he would have to "keep busy, day and night," to avoid sexually abusing or assaulting children. Yet the evidence also shows that although respondent recognized his own dangerous proclivities, he was inconsistent about taking his medicine and had refused to complete intensive sex-offender-related therapy. Respondent also refused to take responsibility for his illegal and antisocial behavior. In Dr. Leavitt's words, respondent's case presented no "mitigating factors."

Given all of this evidence, the trial court had no reason to disbelieve Dr. Leavitt's unequivocal statement that even without the use of the actuarial instruments, he would have concluded to a reasonable degree of psychological certainty that it was substantially probable that respondent would commit another act of sexual violence sometime in the future. Therefore, we cannot doubt that, whatever result a *Frye* hearing may have produced, the trial court would have reached the judgment it did.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

HUTCHINSON and BYRNE, JJ., concur.