*People v. King* (1993), 248 Ill. App. 3d 253, 618 N.E.2d 709 (holding that where no instruction on the State's burden of proof in a criminal trial is given, reversal is not required so long as the jury learned of the proper burden from, *inter alia*, the closing argument of the State).) We view *Sullivan*, although discussing a different burden of proof, as being fully analogous to the case at bar. Accordingly, we reverse the judgment of the circuit court and remand for a new trial to determine defendant's paternity of Raquel.

Reversed and remanded for a new trial.

DiVITO, P.J., and McCORMICK, J., concur.

*In re* J.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.C., Respondent-Appellant).

First District (2nd Division)   No. 1—91—3742

Opinion filed March 22, 1994.

Robert D. Shearer, Jr., of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James

Fitzgerald, and Gunta Z. Hadac, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Following an adjudicatory hearing, the circuit court found respondent J.C. delinquent on the basis of the criminal offenses of murder, unlawful use of a weapon and aggravated battery. Thereafter, the court committed him to the custody of the juvenile division of the Department of Corrections for an indeterminate term. On appeal, respondent contends that (1) the circuit court improperly determined his guilt beyond a reasonable doubt at the close of the State's case; (2) the court erred when it denied his motion to suppress evidence; (3) the evidence established at the hearing was insufficient to demonstrate that he acted intentionally; (4) he was improperly adjudicated a ward of the court; (5) the circuit court failed to consider dispositional alternatives; and (6) the dispositional order wrongly reflects that he was found delinquent of two counts of murder even though only one person was killed.

At the hearing, Elizabeth Gaffney testified that her son Joseph Gaffney was 13 years old when he died on April 12, 1991.

Officer James Shader, an evidence technician with the Chicago police department, testified that on April 12, 1991, at approximately 11 p.m., he responded to a call of a "young boy shot in the head" at 6430 North Harlem. When he arrived at that location, he found Gaffney lying on a dining room chair, with his head resting against a living room chair. He also found a bottle of Chivas Regal whiskey on the kitchen table, and a live, .38 special cartridge in the back stairwell. Later that evening, the police recovered a five-shot, .38 caliber revolver that contained a spent cartridge which was identical to the live cartridge found at the crime scene.

J.O. testified that he was 13 years old, and that on April 12, 1991, he, D.R., and M.C. were at T.C.'s house at 6430 North Harlem. M.C. brought a bottle of whiskey. About 5:45 p.m., respondent arrived at T.C.'s house with S.R., J.J., and J.B. J.O. stated that although several people drank at the party, he did not see respondent doing so. At about 8 p.m., respondent left the party with D.R. and S.R., stating that they were going after some guys that tried to rape respondent's sister. At that time, they were carrying a silver gun with a brown handle. Respondent returned to the party at about 9:30 p.m. and was in the kitchen demonstrating the gun to Gaffney, J.J., M.C. and him. Respondent pretended to put a bullet in the chamber, closed it, pointed it at Gaffney, and pulled the trigger four or five times. While he was doing

this, respondent was saying that he should "blow his [balls][1] off because *** guys shouldn't get hickeys from girls." J.O. noticed that Gaffney had a hickey on the lower left side of his neck. When Gaffney told respondent that he knew the gun was not loaded, respondent opened the gun, put a bullet in the third chamber, and closed the barrel. Respondent again pointed the gun at Gaffney's groin and pulled the trigger twice. As respondent pulled the hammer back and cocked the gun, he apparently realized that the loaded third chamber was the next one. He then ran into the front room, where he pointed the gun to the floor and eased the hammer down so that it would not strike the bullet. After respondent took the bullet out of the gun, the group moved into the front room and began talking among themselves.

Respondent did not put the gun away, however, and shortly thereafter, he opened the barrel and placed the bullet back in the third chamber. He again pointed the gun at Gaffney's groin and pulled the trigger once. Gaffney then told respondent to "[p]oint it at my head, it would be quicker." Respondent then raised the gun, pointed it at Gaffney's head, and pulled the trigger. Gaffney pretended to be shot and fell down. When Gaffney got back up, respondent was smiling and he pointed the gun at Gaffney. He then "pull[ed] the trigger back real slow" and shot Gaffney. Immediately after he shot Gaffney, he yelled "[d]id I do this or is all this unreal?"

On cross-examination, J.O. testified that everybody was laughing and joking and having a good time at the party and that respondent and Gaffney had no arguments prior to the shooting. J.O. further testified that when he arrived at the party, D.R. also had a gun in his possession. During the party, the two guns were on the kitchen table and several people handled them.

V.S. testified that she was 14 years old and that on April 8, 1991, she broke up with Gaffney after dating him for approximately six months. The next day, April 9, respondent asked her if she would "go out with him." She replied that she would, and the two went out for "about a day." On April 10, 1991, she told respondent that "she still had feelings for [Gaffney]" and that she just wanted to be friends. That night she was at a party in the basement at a friend's house when she heard "something that sounded like a pounding on the floor." When she went upstairs to investigate, she saw respondent and Gaffney having an argument.

Two days later, on April 12, 1991, respondent and J.B. came over to

---

[1]The witness originally used the word "groin," but when asked by the assistant State's Attorney, he stated that respondent actually used the word "balls."

her house in the afternoon. Respondent told her that he wanted "to get some guys that were bothering his sister" and showed her a silver gun, with a brown handle. J.B. then began walking down the alley, and she asked respondent what he would do if he was unable to find those people. He replied that he would "find something to do with the gun." The two then began talking about Gaffney, and respondent said that he wanted to "hurt" him. On cross-examination, she testified that respondent and Gaffney were "really good friends," who would always reconcile their differences.

J.J. testified that on the date in question, she and Gaffney had a date to go to T.C.'s party, but she arrived at 4:30 p.m. and he did not arrive until 6 p.m. Respondent was also at the party, but she did not see him drink that evening. His eyes looked "normal," not bloodshot, he was not stumbling, and he did not smell of alcohol. There were two guns at the party; one was small and "looked almost like a toy" and the bigger one was silver with a brown handle. Respondent was showing the bigger gun to "all the other guys."

Later, in the kitchen, respondent was "joking around" by threatening to shoot Gaffney because she gave him a hickey. When he pulled the trigger, Gaffney pretended that he was shot. After doing this a couple times, respondent left the room and when he came back in, she was able to see that he had placed a bullet in the chamber. Respondent pulled the trigger twice and then pulled the hammer back for a third time before realizing that the bullet was in the next chamber. Respondent then set the hammer back, and everyone moved to the dining room. In the dining room, respondent again pointed the gun at Gaffney and he told respondent that it would be faster to shoot him in the head. Respondent then lifted the gun and pulled the trigger twice, the second time shooting Gaffney.

On cross-examination, J.J. testified that only the smaller gun was at the party originally, but respondent and J.B. left the party to get the right size bullets for it. When they returned, respondent had the other gun. She also stated that during the party, the two guns were sitting on a table, and that people would pick them up and play with them, and even dry fire them. Finally, she stated that there was no ill will between respondent and Gaffney.

Chicago police officer Thomas Hoff testified that at about 11 p.m. on April 12, 1991, he received a radio call to go to 7052 North Oleander in order to find a suspect in a homicide. Upon arriving at that location, he observed another officer speaking with an adult male on the back porch of the house. A short time later, a small car pulled up in front of the house with respondent and his mother. He approached the car and asked respondent's mother if she knew what happened and if she was

willing to cooperate. She replied that she wanted to cooperate. When he asked for the gun, she "led" him to an enclosed staircase inside the house, opened the door, and pulled out a stainless steel, snubnose revolver, which was later identified as the gun respondent used to shoot Gaffney. He also stated that respondent did not appear intoxicated.

Chicago police officer Andrew Wallace testified for the defense that when he arrested respondent, he noted that respondent had been drinking on the arrest report because respondent told him that he had been drinking that evening. On cross-examination, however, Wallace testified that he checked that box on the report because respondent said that he had been drinking, even though he did not appear to be intoxicated.

J.B. testified for respondent that he knew both respondent and Gaffney from school, and knew that respondent and Gaffney had a good friendship. On April 12, 1991, he and D.R. went to respondent's house after school. Respondent went up to his room and brought down a gun, but then stated that he had to go back upstairs for the shells. They also got some brass knuckles and a billy club from respondent's house. D.R. also had a smaller gun with him. At about 3:15 p.m., they left respondent's house and went to V.S.'s and then to Monument Park, where they spoke with Gaffney. They told Gaffney that they had the weapons in order to get the guys who did "something" to respondent's sister. Gaffney got a billy club from his grandmother's house, and the four went to T.C.'s house for the party.

At the party, everybody sat around and talked about school. Although there was a bottle of Southern Comfort and a carton of wine, no one was really drinking. About 20 minutes later, respondent left with D.R. and S.S. When they returned, people had begun drinking. J.B. further stated that until he left the party at 9:45 p.m., everyone was drinking the wine, including respondent.

Dr. Marshall Goby testified for respondent that he was a licensed clinical psychologist and had been working with people with addictions since 1974. He further stated that he interviewed and tested respondent twice and based on respondent's statements, he had consumed approximately 10 ounces of alcohol prior to the shooting. Goby determined that respondent has a substance abuse disorder which may develop into dependence if he continues to consume alcohol. Goby further stated that respondent's visual motor skills and attention span are deficient, and he was behind his age group for performance of physical tasks. He determined that these deficiencies negatively affected respondent's ability to understand the consequences of his actions. Furthermore, respondent had a limited ability to understand cause and effect relationships or to draw conclusions from abstract ideas: In his opinion,

consumption of alcohol would exacerbate his disabilities and negatively affect his motor skills and ability to think. Moreover, once he began drinking, respondent would not be able to control his consumption. Finally, Goby concluded that he did not consider respondent dangerous if he was not under the influence of alcohol.

On cross-examination, Goby admitted that he was retained by respondent's family to administer the tests and to testify on his behalf. He also stated that he was aware that a court-appointed psychiatrist found respondent manipulative, but did not take that opinion into account.

Respondent next called Chicago police officer John Santopardre, who testified that pursuant to his investigation in this case, J.J. and J.O. told him that both respondent and Gaffney were drinking at the party. On cross-examination, however, Santopardre admitted that his general progress report did not state that respondent was drinking.

Respondent's mother testified that V.S. called the house often following the incident on April 12, 1991, until respondent went to the Audy home. V.S. also came to her house on several occasions, and one time she took respondent and V.S. to a roller skating rink.

As previously indicated, the circuit court adjudicated respondent a delinquent based on the criminal offenses of murder, unlawful use of a weapon, and aggravated battery.[2] At the subsequent dispositional hearing, Jeffrey McKnight testified for the State that he was a probation officer and conducted respondent's social investigations. After speaking with respondent, his school principal, his parents, and the detention center staff, as well as reviewing respondent's clinical evaluations, he determined that respondent was a danger to the community and should be committed to the custody of the Department of Corrections. Thereafter, the court adjudicated respondent a ward of the court on petition 91—J—7471 (the murder and unlawful use of a weapon charges) and petition 91—J—11264 (the aggravated battery charge), and committed him to the custody of the Department of Corrections for an indeterminate period. This appeal followed.

## I

Respondent first contends that the delinquency finding should be reversed because the circuit court improperly determined respondent's guilt when it denied his motion for a "directed finding" at the close of the State's case.

---

[2]The aggravated battery charge was from a separate and unrelated incident which occurred while respondent was released pending the transfer hearing on the murder charge. Although a separate adjudicatory hearing was held on that charge, the court held only one dispositional hearing.

After the State rested its case in chief, respondent moved for the court to enter judgment in his favor because the State failed to prove beyond a reasonable doubt the elements of first degree murder. In response, the court stated it found "that the prosecution has presented sufficient evidence which, if believed, could support findings of delinquency as charged." When respondent raised the issue in his post-trial motion, the court stated that it "found [that] at the close of the State's case, there was sufficient evidence which was proven beyond a reasonable doubt." Respondent now asserts that the court's statement at the hearing on the post-trial motion demonstrates that the court "prematurely resolved all facts and circumstances on the theory of [respondent's] guilt rather than his innocence." He maintains that because both intoxication and accident are affirmative defenses, the court should have waited until after the close of all evidence before reaching a conclusion.

It must first be noted that there is no procedural mechanism of a "directed finding." (See *People v. Williams* (1993), 256 Ill. App. 3d 370, 373; *People v. Davilla* (1992), 236 Ill. App. 3d 367, 373 n. 3, 603 N.E.2d 666, *appeal denied* (1993), 148 Ill. 2d 646, 610 N.E.2d 1269 (noting the "curious notion that a trial judge may 'direct' himself to make a 'finding' at the request of a litigant").) Instead, section 115—4(k) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—4(k)) authorizes a circuit court in a bench trial to render a "finding" at the close of the State's case.

■ In any event, we find that the circuit court here committed no error in denying respondent's motion. When viewing the evidence in the light most favorable to the State (see *People v. Turner* (1984), 127 Ill. App. 3d 784, 790, 469 N.E.2d 368 (stating the standard for granting a directed verdict)), it becomes clear that the State satisfied its burden. The State's witnesses established that respondent was carrying the gun for much of the day, and that when the shooting occurred, respondent repeatedly took aim and dry fired the gun before finally pointing the gun at Gaffney's head and pulling the trigger while the bullet was located in the first chamber. Moreover, none of the State's witnesses testified that respondent was drinking at the party. Rather, both J.J. and J.O. specifically stated that he was not and Officer Hoff stated that respondent did not appear intoxicated when he arrested him. Accordingly, in light of the State's evidence, respondent's motion for judgment at the close of the State's case was properly denied. Moreover, the court's statement at the post-trial hearing did not reflect that it had prejudged the case.

## II

Respondent next contends that the circuit court erred when it de-

nied his motion to suppress the gun because it was seized pursuant to an illegal, warrantless search of his home.

Prior to trial, respondent moved to suppress the weapon which was recovered from his house after the shooting on the grounds that the police illegally entered his house and began to search without first obtaining a warrant or requesting consent. He also argued that no exigent circumstances existed to justify the warrantless entry.

At the hearing on the motion, respondent's father testified that he was a Chicago police officer and on April 12, 1991, he had been sleeping at his house between 10:30 and 11 p.m. when he heard someone say "police officers, is anybody home?" He then proceeded downstairs and saw several police officers in the house going from room to room, even though he did not give them permission to enter. He explained that he kept the doors closed but not locked when his kids were out. He further explained that he kept a silver, six-shot service revolver and a silver, five-shot off-duty weapon in the house. Both were registered to him. One of the officers asked him to look for his guns, and he then noticed that the five-shot gun was not where he had left it.

Respondent's mother testified that on the day in question, respondent came home crying between 10:30 and 11 p.m. He was upset and told her that he had shot Gaffney. Respondent handed her the gun and she put it on the stairwell. She then took respondent back to T.C.'s house, but when she saw the police and ambulance there, she turned around and returned home. By the time they arrived at their house, the police were already there. As they pulled up, the police surrounded the car, and when respondent exited the vehicle, he was handcuffed by one of the officers.

Respondent's mother noticed that between 8 and 10 police officers were walking in and out of her house. Knowing what kind of damage occurs when police search a home, she became worried because she did not know what they were doing inside the house; "wondering *** if they were going through everything."

Officer Hoff then approached her and asked for the gun. When she told him that it was inside, he said "[l]et's get the gun" and began walking toward the house. She explained that although she never told him he could enter the house, she followed him because he was a police officer. She then retrieved the gun from where it was resting in plain view in the stairwell and gave it to him.

Officer Wallace then testified for the State that on the evening of April 12, 1991, he responded to a radio call of a shooting at 6430 North Harlem. When he arrived at that location, he observed Gaffney's body lying on a chair. He then spoke with a young girl (whose name he could not remember) who told him that respondent brought a gun, shot

Gaffney in the face, and then ran out with several other kids. Wallace then left that location and proceeded to respondent's house because he knew where respondent lived.

On his way to respondent's house, and only minutes after leaving the scene of the shooting, he stopped three children who were running down the street in order to ascertain why they were out so late. The children told him that they were leaving a party where someone was shot. They said that respondent brought a gun to the party and shot another boy, and then ran ahead of them and talked about shooting himself. Wallace then went to respondent's house, arriving just a few minutes after 11 p.m. At that time, no other police vehicles were at respondent's house.

He entered the house through the rear porch door and then through the kitchen door which was open. As he entered, he called out "Police. Police. Is anybody home?" Respondent's father entered the kitchen in his underwear, identified himself as a police officer, and asked what was happening. He then told respondent's father that he believed respondent had shot someone and asked if respondent was home. Respondent's father replied that he did not think respondent was home. He then asked where respondent could have gotten a gun, and respondent's father responded by going to check his guns. When he came back, he said that both of his guns were gone. At that time, other officers began pounding on the front door and respondent's father opened the door and let them in. Wallace then left the house and told Officer Hoff and the others that respondent was not inside. He and Hoff then went to the front of the house, where they saw respondent and his mother pull up in a car. Wallace walked to the passenger side, asked respondent his name, and told him to step out of the car. He then placed respondent under arrest, handcuffed him, read him his *Miranda* rights, and placed him in the back of his squad car. Hoff was on the other side of the car talking to respondent's mother, telling her that they needed the gun. She replied that she wanted to cooperate. Hoff then followed her into the house. Later, Hoff brought the gun to the squad car.

Officer Hoff's testimony was substantially similar to Wallace's. He stated that when respondent's mother exited her vehicle, she told him that she was aware of what happened and wanted to cooperate. He told her that he needed to retrieve the gun and she said that she would give it to him. He then followed her inside, where she went to the stairwell, reached in, and took out a stainless steel snubnose revolver.

In rebuttal, respondent's father testified that two other police officers were on the back porch with Wallace. He also denied opening the front door for the officers. Finally, he stated that the protection of his family was more important to him than an order from the police de-

partment, and that he would talk to an attorney before turning over his gun even if given a direct order to do so.

The circuit court then denied respondent's motion. It found that the first entry by Wallace was justified by the exigent circumstances of the situation and that respondent's mother voluntarily consented to Hoff's entry. The court specifically found the officers to be credible witnesses, while respondent's parents were not.

■ Illinois law is well settled that a reviewing court will not disturb a circuit court's finding on a motion to suppress unless it is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 234, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898.) It is the function of the circuit court in a hearing on a motion to suppress to determine the credibility of the witnesses and to resolve any conflict in their testimony (*People v. Redd* (1990), 135 Ill. 2d 252, 289, 553 N.E.2d 316), and a reviewing court may not substitute its judgment as to the weight of disputed evidence or the credibility of the witnesses. *People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.

In the instant case, the circuit court expressly found that the State's witnesses were credible and respondent's were not. We find no basis for concluding that the circuit court's findings were manifestly erroneous.

## III

Respondent next contends that the evidence presented at the adjudicatory hearing was insufficient to prove that he acted intentionally; he asserts that the finding of delinquency based on murder should be reversed. He maintains that while J.J.'s and J.O.'s testimony regarding the repetitive dry firing of the gun, the loading and unloading of the gun, and the continual aiming at Gaffney "militate[s] against a finding of misadventure," the testimony of respondent's witnesses demonstrated that he was drunk at the time of the shooting and his judgment and reasoning were impaired. The State responds that the evidence was sufficient to support a finding of delinquency based on murder.

When the sufficiency of the evidence of guilt is challenged on appeal, the reviewing court must determine whether, construing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Because the trier of fact has the opportunity to observe the demeanor of the witnesses and to weigh their credibility, a reviewing

court will not substitute its judgment for that of the circuit court unless the determination is so unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

■ In the instant case, the circuit court apparently found that the State's witnesses were more credible than respondent's. Because the question of whether respondent acted intentionally or was unable to control himself due to intoxication rests on a credibility determination, we cannot second-guess the circuit court. Accordingly, we find the evidence presented at the adjudicatory hearing to be sufficient to support a finding of delinquency based on murder.

Respondent also argues, in the alternative, that his delinquency finding should be reduced from murder to involuntary manslaughter because the evidence demonstrates that he was acting recklessly without the intent to injure rather than intentionally trying to harm Gaffney. However, when viewing the evidence in the light most favorable to the prosecution, we find no support for respondent's arguments. Intent to kill may be inferred from the character of the acts and the circumstances surrounding the commission of the offense. (*People v. West* (1990), 137 Ill. 2d 558, 585-86, 560 N.E.2d 594, *cert. denied* (1991), 500 U.S. 928, 114 L. Ed. 2d 126, 111 S. Ct. 2042.) Moreover, a person is presumed to intend the natural and probable consequences of his actions. (*West*, 137 Ill. 2d at 585.) We therefore affirm the circuit court's finding of delinquency based on the criminal offense of murder.

## IV

Respondent next contends that the circuit court improperly adjudicated him a ward of the court on the murder count and the aggravated battery charge after conducting the dispositional hearing. He asserts that section 5—20 of the Juvenile Court Act (Ill. Rev. Stat. 1991, ch. 37, par. 805—20 (now codified as 705 ILCS 405/5—20 (West 1992))) requires that after a court determines that the minor is delinquent, it must determine whether the minor should be made a ward of the court before the dispositional hearing. We note, however, that this reading of the statute is incorrect. The statute specifically states:

"After hearing the evidence the court shall make and note in the minutes of the proceeding a finding of whether or not the minor is delinquent. If it finds that the minor is not such a person, the court shall order the petition dismissed and the minor discharged from any detention or restriction previously ordered in such proceeding. If the court finds that the minor is [such] a person *** , the court shall then set a time for a dispositional hearing to be conducted *** at which hearing the court shall determine

whether it is in the best interests of the minor and the public that he be made a ward of the court. To assist in making this and other determinations at the dispositional hearing, the court may order that an investigation be conducted and a social investigation report be prepared." Ill. Rev. Stat. 1991, ch. 37, par. 805—20 (now codified as 705 ILCS 405/5—20 (West 1992)).

■ Thus, under the plain language of the statute, the court must first determine that the minor is delinquent before it can conduct a dispositional hearing, but it should not adjudicate a minor to be a ward of the court until *after* the dispositional hearing is held. The rationale underlying this is to allow the minor to benefit from the court's consideration of the dispositional evidence prior to the entry of an order of wardship. (*In re P.E.K.* (1990), 200 Ill. App. 3d 249, 251, 558 N.E.2d 763.) Accordingly, we find that no error occurred when the circuit court entered its order of wardship at the end of the dispositional hearing.

Respondent also asserts that the circuit court erred in failing to adjudicate him a ward of the court on the unlawful use of weapons charge even though it committed him to the Department of Corrections on all three charges. Our review of the record of the dispositional hearing shows, however, that respondent was adjudicated a delinquent under petition 91—J—7471, which included both the murder charge and the unlawful use of a weapon charge. Accordingly, no error occurred.

## V

Respondent also contends that the circuit court erred in failing to consider dispositional alternatives before committing him to the Department of Corrections. He asserts that the court mistakenly believed that it had no other choice but to accept the probation officer's recommendation and send him to the Department of Corrections.

The disposition of a minor rests within the sound discretion of the circuit court, and a reviewing court will not disturb that decision absent an abuse of that discretion. (*In re J.C.* (1987), 163 Ill. App. 3d 877, 886, 516 N.E.2d 1326, *appeal denied* (1988), 119 Ill. 2d 566, 522 N.E.2d 1251.) When determining the appropriate disposition, the circuit court may choose as it sees fit, among the various alternatives, and not defer to any particular recommendation. (*In re T.A.C.* (1985), 138 Ill. App. 3d 794, 797-98, 486 N.E.2d 375.) However, because delinquency proceedings are protective rather than punitive in nature, "[c]ommitment is to be used only when less severe placement alternatives would not be in the best interests of the minor and the public." *In re B.S.* (1989), 192 Ill. App. 3d 886, 891, 549 N.E.2d 695.

■ In the instant case, the court specifically stated that commitment was the only alternative available because respondent was "utterly beyond the control of his parents" and because the Department of

Corrections offered counseling and therapy programs to provide the guidance respondent needed. We therefore find that respondent's commitment to the Department of Corrections was a valid exercise of the circuit court's discretion.

## VI

■ Respondent lastly contends that the dispositional order improperly reflects that he was determined to be delinquent on two counts of murder even though only one person was killed. Because the State concedes[3] that the order is improper, we exercise our authority under Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)) and order that the dispositional order be amended to reflect a delinquency determination on one count each of murder, unlawful use of a weapon, and aggravated battery.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.

---

[3]We note, however, that the State need not have conceded this point. Although it is true that where only one person is murdered, there can be only one conviction of murder and judgment entered on only one count (*People v. Montes* (1989), 192 Ill. App. 3d 874, 884, 549 N.E.2d 700, *appeal denied* (1990), 132 Ill. 2d 551, 555 N.E.2d 383), the same rule does not apply to juvenile proceedings because only one finding of delinquency can be entered upon the filing of a single petition for adjudication of wardship, even if it is predicated upon multiple offenses arising from the same conduct. (*In re Mareno* (1976), 43 Ill. App. 3d 556, 558, 357 N.E.2d 592.) In *Mareno*, this court rejected an issue identical to the one in the instant case. There, the minor was found delinquent on the basis of one count of aggravated assault and one count of criminal damage to property which arose from his firing a shotgun. On appeal, the court noted that multiple convictions based on the same conduct are improper in the criminal context, but stated that no such impropriety occurs in a juvenile case where the circuit court makes only one finding of delinquency. *Mareno*, 43 Ill. App. 3d at 558; see also *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1015, 431 N.E.2d 759, *cert. denied* (1982), 459 U.S. 869, 74 L. Ed. 2d 128, 103 S. Ct. 153 (rejecting the minor's contentions that the circuit court improperly entered findings on both solicitation to commit murder and conspiracy to commit murder because unlike a criminal conviction, the dual findings could not result in a longer commitment to the Department of Corrections).