*In re* RICARDO A. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Ricardo A. *et al.*, Respondents-Appellants).

First District (2nd Division)    Nos. 1—02—3869, 1—02—3870, 1—02—3873 cons.

Opinion filed April 5, 2005, *nunc pro tunc* February 22, 2005.

Michael J. Pelletier and Yasemin Eken, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary L. Boland, and Stephanie A. Buck, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BURKE delivered the opinion of the court: Respondent minors Ricardo A., Byron R., and Lavale R. appeal from orders of the circuit court adjudicating them delinquent and sentencing them to five years' probation after finding that each had committed the offenses of aggravated vehicular hijacking, vehicular hijacking, armed robbery based on taking the victim's car, armed robbery based on taking the victim's wallet, aggravated battery with a deadly weapon, aggravated battery in a public place, battery, and criminal trespass to a motor vehicle. The trial court also found that Ricardo had committed the offense of possession of a stolen vehicle. On appeal, respondents contend that the State failed to prove them guilty of vehicular hijacking and aggravated vehicular hijacking and that the findings with respect to vehicular hijacking, armed robbery by taking the car, possession of a stolen vehicle, criminal trespass to a vehicle, aggravated battery in a public place, and battery must be vacated because these offenses either are lesser-included offenses of other offenses they were found to have committed or violate the one-act, one-crime rule. Ricardo also contends that the trial court lacked jurisdiction to adjudicate him delinquent because the State failed to serve notice of the petition for adjudication of wardship upon his father. For the reasons set forth below, we affirm in part and vacate in part.

## STATEMENT OF FACTS

Petitions for adjudication of wardship were filed against the three respondents,[1] alleging they were delinquent based on the commission of the following offenses: armed robbery based on the taking of money, armed robbery based on the taking of a motor vehicle, aggravated bat-

---

[1] A fourth individual, Kirk B., was also charged, but did not appeal.

tery with a weapon (a bat), aggravated battery in a public place, battery, criminal trespass to a vehicle, aggravated vehicular hijacking, and vehicular hijacking. Ricardo was also charged with possession of a stolen vehicle. The offenses arose out of an incident that occurred on September 19, 2002.

At the first appearance in court, the following colloquy occurred with Ricardo:

"THE COURT: And your biological father is Norton Brandt?

MINOR A[ ]: Yes, sir.

THE COURT: Do you know where Mr. Brandt lives?

MINOR A[ ]: No. Sir.

THE COURT: Have you had any contact with your dad in the last year?

MINOR A[ ]: Yes, sir.

THE COURT: How do you get a hold of him, or how does he get a hold of you?

MINOR A[ ]: Call him at his job."

Thereafter, in discussing amendments to the petitions, the court made the following statement: "Leave to amend the petition [with respect to Ricardo] is granted. Mother and father—Mother to be served by way of summons. Father to be served by way of publication, correct?" In response, the assistant State's Attorney said, "Yes, Judge."

All three respondents were tried at a joint adjudicatory hearing. Jimmy Fernandez, the victim, testified that on September 19, 2002, he had access to a Plymouth Acclaim that belonged to his father, which he was buying from him. Fernandez stated that he only had access to the car at certain times and was not allowed to use it at night. Between 8 and 9 a.m., he took his father to work in that car and then returned home to pick up his mother and sister for a funeral. Following the funeral, at approximately 11 or 11:30 a.m., the three went to a restaurant to eat. Fernandez then took his mother and sister home. He again left the house to pick up his niece and nephew from school. En route, he saw Lavale, who waved him over. Fernandez pulled over into a keyhole, a driveway between two sets of row houses. Lavale asked Fernandez for some change, which Fernandez gave him, as he had done in the past, and then Lavale told Fernandez that "[t]hey were going to take [his] car until [he] brought Martene over." At this time, Fernandez had exited the car and had his car keys with him. According to Fernandez, some other guys then came and started jumping him. Fernandez stated there was a total of six guys, including the four respondents, and that they kicked and punched his head, sides, and body. Ricardo also hit him over the head with a bottle. Thereafter, the two other guys, Wickett and Pierre, showed up with bats and Pierre

hit him in the back of his head with the bat. At this time, the others were still kicking and punching him.

Fernandez then noticed people coming out of the school next door and that many were on their cell phones. According to Fernandez, his attackers started to disperse at this time. Fernandez then noticed that his wallet was gone. When asked what occurred after this, Fernandez stated:

"I was walking away, I started walking away. I heard the car start up. I turned back around and I seen the one driver, he had flew past me, drive off in my car. I pointed to the school and I say, look at all the people on the cell phones. He give me like, a funny smirk, like, right, and he drove off."

Fernandez identified Ricardo as the driver. When specifically asked about the distances during the course of the events, Fernandez testified as follows:

"Q. When the car was taken from you, how close were you to the car?

A. 10 feet, 5 feet, but when he drove off I was talking to him through the window, you know.

Q. How close were you at that point?

A. I could touch the car.

Q. Within a foot?

A. Yes."

After the car drove off, Fernandez ran across the school yard to his mother's house and called the police. He was told where to pick up his car by the police. When he arrived at the place the police told him to pick up his car, the police had four individuals, whom he identified as the four respondents, in custody. Fernandez did not know any of the respondents by name, but had seen them on the streets before.

On cross-examination by Lavale's attorney, with respect to distance, Fernandez gave the following testimony:

"Q. You did not actually see the individual get in the car, correct?

A. I seen him drive away.

Q. You didn't see him enter the car, correct?

A. I heard it start up. I looked back, he was in the car.

Q. And you were about 20 feet away from the car when it started up?

A. Yes, I could—it's like from here to the wall, that is how close.

Q. Judge, for the record about 20, 25 feet. You were starting to walk away, you said, before you realized that the car was starting, correct?

A. Yes, before I was thinking about the car then I stopped and I turned around I heard the car start. I could see him in the car.

\* \* \*

Q. *** My question is, were you getting ready to walk away when you heard the car starting?

A. Yes."

The State presented additional witnesses, but their testimony is not relevant to the issues on appeal. After the State rested, respondents moved for directed findings or acquittal, which the trial court denied.

Jakeshia Beals was called to testify by Kirk, her boyfriend. According to Beals, at approximately 12:40 a.m. on September 18, she was sitting in front of her house. She saw Ricardo and his girlfriend driving by in a white, four-door car, and waved them down because she wanted to know where the car came from since she knew it was not Ricardo's car. Ricardo told Beals that he had rented the car from Jimmy. The next day, at approximately 11 a.m., Kirk came to Beals' home. At approximately 11:50 a.m., Ricardo drove up in the same car, Kirk got into the car, and the two left.

Ricardo testified on his own behalf. He stated that at approximately 11 p.m. on September 18, he was walking around the projects when he saw Fernandez. Ricardo flagged Fernandez down, Fernandez pulled over, and the two talked. According to Ricardo, Fernandez said he was looking for crack. Ricardo told Fernandez that he did not have any because he was no longer dealing in the area. Ricardo then asked Fernandez if he could rent his car—a white, four-door Plymouth—because he had something to do in the morning. According to Ricardo, Fernandez agreed. Ricardo gave Fernandez $20 and Fernandez gave him the keys. Ricardo drove away and picked up his girlfriend. The two went to a White Castle and then to his aunt's house. En route to his aunt's house, he saw Beals, who stopped him. After they had a conversation, he parked the car and went into his aunt's house.

At approximately 9 a.m. the next morning, Ricardo left the house and went to register for his GED. He remained at the school for approximately two hours. After that, he got gas and some pot and picked up Kirk in the projects. He then picked up Lavale and, a little farther down the road, he picked up Byron. According to Ricardo, when he was driving past the keyhole, Fernandez came running out and flagged them down. Fernandez was yelling that he had to bring the car back. As Ricardo pulled over to let Kirk out, a police car pulled up behind him. When questioned by the police, Ricardo told them he had rented the car. Thereafter, the four were arrested and taken to the police station.

On cross-examination, Ricardo admitted that Fernandez did not live near the area where the "rental" agreement took place. Respondents then rested.

In rebuttal, the State presented the testimony of Rosalo Fernandez, Jimmy's father. Rosalo testified that on September 19, at around 8:30 a.m., his son took him to work in the Plymouth and then took his mother and sister to a funeral. Rosalo further stated that Fernandez was not allowed to loan the car to anyone else. The State then rested.

The trial court found Rosalo's testimony credible, which, according to it, meant that the car could not have been rented the prior evening. Based on this, the court found the State had proved all charges against respondents. The court acknowledged that Fernandez had been impeached on some things, but stated his testimony had been corroborated by other evidence. According to the court, "based on the evidence that I've heard, there is a finding of delinquency for all 4 defendants" on all counts.

Thereafter, respondents filed motions to reconsider the findings of guilt, which the trial court denied. Respondents were then each sentenced to five years' probation. This appeal followed.

## ANALYSIS

### I. Failure to Notify Father

Respondent Ricardo first contends that the trial court lacked jurisdiction to adjudicate him delinquent and he was denied due process because the State failed to serve his noncustodial father with the delinquency petition even though respondent advised the court he had been in contact with his father in the last year and could contact him at work. According to respondent, the State utilized no due diligence in attempting to locate his father and, rather, served him by publication notice, which itself was defective since there is no evidence it was sent to his last known address.

The State contends that respondent waived review of this issue because he failed to raise it in the trial court. Substantively, the State contends that it was not required to notify respondent's father at all and, thus, since there was no due diligence requirement imposed upon it, respondent's due process rights were not violated. Additionally, the State maintains that because it was not required to serve respondent's father, even by publication, any defects in the publication notice it did issue are irrelevant.

■ Notice of delinquency proceedings must be provided to a juvenile's parents. 705 ILCS 405/5—525(1)(a) (West 2000). A noncustodial parent should be served personally or by mail whenever it is possible to do so. *In re Tyrone W.*, 326 Ill. App. 3d 1047, 1049, 762 N.E.2d 1159 (2002). "However, it is notice to the custodial parent that is crucial." *In re Tyrone W.*, 326 Ill. App. 3d at 1049-50. In other words, "notice by publication [to a noncustodial parent whose address

is unknown] is not necessary if the minor's legal custodian has already been served personally or by certified mail." *In re L.C.C.*, 167 Ill. App. 3d 670, 672, 521 N.E.2d 652 (1988).

A juvenile may forfeit review of the issue of lack of notice to a noncustodial parent. *In re Tyrone W.*, 326 Ill. App. 3d at 1050. Specifically, a

"respondent minor waives the issue of the lack of notice to a noncustodial parent unless the minor brings before the trial court the State's failure to *** locate a noncustodial parent whose *** address is not known to the State at the outset of the proceedings. A minor also may waive any question regarding the State's diligence in attempting to locate and serve a noncustodial parent." *In re Tyrone W.*, 326 Ill. App. 3d at 1050.

See also *In re J.P.J.*, 109 Ill. 2d 129, 137, 485 N.E.2d 848 (1985) ("unless some question is raised in the circuit court regarding the failure to identify or locate a noncustodial parent whose *** address is not known to the State at the outset of the proceedings, the matter is waived and diligence may be assumed"); *In re B.L.*, 315 Ill. App. 3d 602, 605, 734 N.E.2d 476 (2000) (same); *In re D.L.*, 299 Ill. App. 3d 269, 272, 701 N.E.2d 539 (1998) (same).

Several cases are directly on point and dispositive on the issue of forfeiture. In *In re Tyrone W.*, the respondent's mother indicated at one hearing that she could provide the State with the respondent's father's address. *In re Tyrone W.*, 326 Ill. App. 3d at 1050. However, the State made no attempt to locate the respondent's father. *In re Tyrone W.*, 326 Ill. App. 3d at 1050. On appeal, the respondent argued that the lack of notice to his father deprived the circuit court of jurisdiction. *In re Tyrone W.*, 326 Ill. App. 3d at 1049. The appellate court rejected this argument, stating that "[a]lthough the State could have been more diligent in its attempt to locate and notify the noncustodial father of the proceedings, the minor's failure to raise this issue in the trial court, particularly when he was represented by counsel, renders his jurisdictional argument waived on appeal." *In re Tyrone W.*, 326 Ill. App. 3d at 1050.

Even more on point is *In re B.L.* There, the State did not have the correct address for the respondent's noncustodial father, but at one hearing, the minor indicated he had his father's telephone number. *In re B.L.*, 315 Ill. App. 3d at 605. The trial court directed the minor to give the number to his attorney to contact the father. Apparently, neither the respondent's attorney nor the State ever made any additional effort to contact the respondent's father. In concluding that the trial court did not lack jurisdiction based on the failure to serve notice upon the respondent's father, the *In re B.L.* court stated that

"[w]hile the State could have been more diligent in its attempts to properly serve [the father], the minor did not raise the State's diligence in the circuit court and even failed to object when the court instructed the minor and his attorney to find [the father]." *In re B.L.*, 315 Ill. App. 3d at 605. According to the court, the case before it was not so much a case of waiver but of "procedural default wherein the minor and his attorney volunteered to act" and, accordingly, the court found that "[t]he minor should not be allowed to appeal based on his own complicity in creating the issue that he now claims is error." *In re B.L.*, 315 Ill. App. 3d at 605.

In the instant case, respondent, his mother, and his attorney all stood silent before the trial court with respect to the lack of notice to respondent's father and the State's lack of diligence in attempting to locate him. None of them objected when the trial court stated that notice would be by publication. Although the State could have been more diligent, respondent's failure to raise the issue before the trial court renders the issue forfeited. Moreover, respondent indicated that he could provide the court with his father's work telephone number. However, there is no evidence he did so. Apparently, nothing was done thereafter by either the State or respondent's attorney to contact respondent's father. Yet again, neither respondent, his mother, nor his attorney objected. As in *In re B.L.*, it was respondent's own complicity that created the problem and he cannot now complain about the lack of notice to his father.

Even assuming, *arguendo*, that respondent did not forfeit review of this issue, we would not find that his due process rights were violated. The State was not required to serve notice upon respondent's father because his mother, who had sole custody, was served and was present for all proceedings. See *In re R.D.*, 148 Ill. App. 3d 381, 385, 499 N.E.2d 478 (1986) (the State had no obligation to publish notice to the noncustodial father because service was made on the custodial mother). See also *In re J.P.J.*, 109 Ill. 2d at 139 (service by publication on the noncustodial parent was excused because the custodial parent was served). Moreover, there is no evidence that respondent and his father had a significant relationship warranting service upon his father. In this regard, although respondent indicated that he had been in contact with his father the last year, he did not know where his father lived, and there is no evidence as to the amount of contact the two had and certainly no evidence that they maintained regular contact. "Inadequate notice to a father does not deprive a minor of due process where they did not have a significant relationship." *In re L.C.C.*, 167 Ill. App. 3d at 673. See also *People v. Taylor*, 101 Ill. 2d 377, 384-85, 462 N.E.2d 478 (1984) (the failure to notify the

defendant's noncustodial father did not deprive him of due process where there was no evidence that the father had shown any interest in the defendant's care or well-being for many years prior to the proceedings). Additionally, there is no evidence as to what assistance or protection respondent's father could have provided to him had he been present during the proceedings. See *In re L.C.C.*, 167 Ill. App. 3d at 673. As such, we find that the State was not required to serve notice upon respondent's father. Because the State was not required to serve him, we need not address the issue of the inadequacy of the notice that he was given. *In re J.P.J.*, 109 Ill. 2d at 139 (although service by publication was excused, the State did serve the noncustodial father by publication and any alleged defects in that notice "need not be considered").

We briefly note that *In re C.H.*, 277 Ill. App. 3d 32, 660 N.E.2d 545 (1995), upon which respondent relies in support of his argument that he was denied due process because his father was not notified, is distinguishable from the instant case. In *In re C.H.*, the evidence showed that the respondent's father had been paying child support for the respondent and had worked at the same job for 18 years. *In re C.H.*, 277 Ill. App. 3d at 35. Because of these facts, the court in *In re C.H.* concluded that the father was easy to locate and the State's failure to "exercise[ ] even a small degree of diligence," through which it could have located the father, denied the respondent due process of law. *In re C.H.*, 277 Ill. App. 3d at 35. In so holding, the court distinguished other cases in which the courts had found that a lack of notice to a noncustodial parent did not deny due process because in those cases there was no evidence the noncustodial parent was paying child support, it would have been difficult to locate those parents, and there had been no evidence of any significant relationship between the respondents and the noncustodial parents. *In re C.H.*, 277 Ill. App. 3d at 35-36. The same is true in the instant case. There is no evidence that respondent's father paid child support, no evidence he was easy to locate, and no evidence of a significant relationship with respondent.

"Unless a minor shows some significant relationship with a noncustodial parent that is affected by the adjudication, he cannot stand silent at a hearing where he is represented by counsel and where his custodial parent is present and then later be heard to complain about lack of notice." *In re S.W.C.*, 110 Ill. App. 3d 695, 698-99, 442 N.E.2d 961 (1982). Respondent here stood silent and failed to demonstrate a significant relationship with his father. As such, we would find, even absent forfeiture of this issue, that he was not denied due process by the State's failure to notify his father of the proceedings. Accordingly, we conclude that the trial court did not lack jurisdiction over this matter and its adjudication need not be vacated as void.

## II. Sufficiency of the Evidence

■ Respondents next contend that the State failed to prove them guilty beyond a reasonable doubt of aggravated vehicular hijacking and vehicular hijacking because there was no evidence that Fernandez was in the "immediate presence" of his car at the time it was forceably taken from him. Rather, according to respondents, the evidence shows he was 20 to 25 feet away from the car, walking farther away when it was started. Respondents maintain that the fact Fernandez was near the car when the keys were taken is not sufficient to constitute "immediate presence." Respondents also argue that we review this issue *de novo.*

The State contends that because respondents dispute the trial court's credibility assessment of Fernandez, our review is not *de novo.* Substantively, the State contends that it proved respondents guilty beyond a reasonable doubt because Fernandez's testimony was that he was 5 to 10 feet from the car when it was taken and within 1 foot when it was driven off, which demonstrates he was in the "immediate presence" of it. The State argues that the fact Fernandez testified he was 20 to 25 feet away when the car was *started* does not contradict his testimony that he was 5 to 10 feet away when it was *taken.* Additionally, according to the State, the fact that Fernandez testified that he was walking away from the car when it was started is not the same as testimony that he was walking away when the car was taken, which he did not so state.

In considering a respondent's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the respondent guilty beyond a reasonable doubt. *People v. Tenney,* 205 Ill. 2d 411, 427, 793 N.E.2d 571 (2002). However, where the facts are not in dispute, a defendant's guilt is a question of law, which we review *de novo. People v. Smith,* 191 Ill. 2d 408, 411, 732 N.E.2d 513 (2000). "A person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18—3 (West 2000).

The parties acknowledge that the only two cases that discuss the meaning of "immediate presence" as used in the vehicular hijacking statute are *People v. Cooksey,* 309 Ill. App. 3d 839, 723 N.E.2d 784 (1999), and *People v. McGee,* 326 Ill. App. 3d 165, 761 N.E.2d 741 (2001). In *Cooksey,* as the victim left a mall entrance, preparing to make a bank deposit, she was jumped by the defendant. *Cooksey,* 309 Ill. App. 3d at 842. She dropped the deposit bag and ran for help. The defendant caught up with her, stuck "something" in her back, and

demanded her car keys. The victim gave her keys to the defendant and then ran into the mall. A short time later she returned to the parking lot and her car was gone. *Cooksey*, 309 Ill. App. 3d at 842. The defendant was convicted of vehicular hijacking and argued on appeal that the State failed to prove him guilty of that offense, specifically, that the victim was in the "immediate presence" of the vehicle when it was taken. *Cooksey*, 309 Ill. App. 3d at 846-47. Noting that the case was one of first impression since no Illinois case had interpreted the term "immediate presence," the *Cooksey* court first looked to the legislative debates, finding they made it clear that the driver or passenger must be in the "immediate vicinity of the car" at the time it is taken to constitute "immediate presence." *Cooksey*, 309 Ill. App. 3d at 848. The *Cooksey* court concluded that the State failed to prove the defendant guilty of vehicular hijacking because the undisputed evidence showed that at no time did the victim approach her car, she was 25 feet away from it when the defendant first jumped her, and, when she ran, she fled away from the car, not towards it. *Cooksey*, 309 Ill. App. 3d at 848.

In *McGee*, the defendant was convicted of aggravated vehicular hijacking and maintained on appeal that the State failed to prove him guilty beyond a reasonable doubt because it failed to prove he took the victim's car from her "immediate presence." *McGee*, 326 Ill. App. 3d at 166. The evidence showed that the victim was attacked inside a home, at which time her attackers took her car keys. *McGee*, 326 Ill. App. 3d at 167. They then fled from the home in her car, leaving her behind in the house. *McGee*, 326 Ill. App. 3d at 167. Reviewing the question as a matter of law because the evidence was undisputed that the victim's vehicle was parked in the driveway when she was assaulted and her keys were taken (*McGee*, 326 Ill. App. 3d at 168), and looking to both the legislative history and *Cooksey*, the *McGee* court found that "immediate presence" meant that the "vehicle is within the immediate control of the alleged victim at the time of the occurrence" (*McGee*, 326 Ill. App. 3d at 170). The *McGee* court found that the State failed to prove the defendant guilty of aggravated vehicular hijacking because the victim's keys were taken from her by force when her vehicle was located some distance from that occurrence. *McGee*, 326 Ill. App. 3d at 170.

Neither *Cooksey* nor *McGee* is instructive in the instant case. *Cooksey* is distinguishable because it is clear the victim there was never less than 25 feet from her car, whereas here, the evidence showed that Fernandez was 5 to 10 feet away and even 1 foot away. *McGee* is also distinguishable since the victim was inside a house and nowhere near her car when it was taken. Moreover, neither case defines "immedi-

ate" nor gives guidance in that regard. "Immediate" means "being near at hand: not far apart or distant." Webster's Third New International Dictionary 1129 (1993).

While it is true Fernandez testified that he walked away from the car after he was beaten, he also testified that he turned around thereafter. Although respondents rely on Fernandez's testimony that he was 20 to 25 feet away when the car started, there are problems with this testimony. First, where respondent's counsel obtained the distance of 20 feet is not evident from the record. Nowhere prior to this time was there any testimony from Fernandez in connection with a distance of 20 feet. Second, in stating the distance for the record, the distance of 20 to 25 feet was respondent's attorney's estimation, not words out of Fernandez's mouth. In any event, despite this testimony, Fernandez positively stated on direct examination that he was within 5 to 10 feet of the car when it was taken from him. Additionally, as he was talking to Ricardo through the window, Fernandez stated he was within one foot of the car when Ricardo drove by. We find that this distance is not far apart or distant and fulfils the definition of "being near or at hand," particularly since Fernandez stated he could have touched the car. Obviously, this is at hand. Reviewing the evidence in the light most favorable to the State, we find that the evidence was sufficient for a rational trier of fact to find respondents guilty beyond a reasonable doubt on the charges of aggravated vehicular hijacking and vehicular hijacking.

### III. One-Act, One-Crime and Lesser-Included Offenses

█ Respondents lastly contend that the findings of delinquency with respect to certain offenses must be vacated because they are either lesser-included offenses of another offense or violate the one-act, one-crime rule. Specifically, respondents maintain that the findings with respect to vehicular hijacking, possession of a stolen vehicle (Ricardo), and criminal trespass to a motor vehicle must be vacated because they are lesser-included offenses of aggravated vehicular hijacking. Respondents also maintain that the finding with respect to battery must be vacated because it is a lesser-included offense of aggravated battery. With respect to armed robbery based on the taking of Fernandez's car, respondents maintain that this finding must be vacated because (1) the elements are almost identical to aggravated vehicular hijacking and vehicular hijacking because, as charged, the two offenses resulted from the same conduct and (2) the armed robbery statute specifically exempts the taking of a motor vehicle from the definition of armed robbery. Lastly, respondents maintain that the finding of delinquency with respect to aggravated battery in a public

place must be vacated because it is based on the same conduct as aggravated battery with a deadly weapon.

The State contends that respondents waived this issue because they failed to object in the trial court and failed to include it in their posttrial motions. Substantively, the State contends that the findings should be upheld because there was only one finding of delinquency as to each respondent and the dispositional orders did not refer to any specific offense as the basis for a finding of delinquency. Thus, according to the State, respondents did not suffer any prejudice.

Respondents respond that we should review this issue under the plain error doctrine. Substantively, respondents contend that recent amendments (effective 1999) to the Juvenile Court Act of 1987 treat juveniles like adults, renaming "adjudication hearing" to "trial" and "disposition hearing" to "sentencing hearing,"[2] and requiring subsequent courts to review the specific offenses for which a juvenile was found delinquent and, therefore, juveniles are now prejudiced by multiple-offense findings. Specifically, the Juvenile Court Act now allows past juvenile "convictions" to be admitted in later proceedings to impose a harsher sentence, set bail, or determine fitness (705 ILCS 405/5—150 (West 2000)[3] ; 730 ILCS 5/5—5—3.2(a)(3) (West 2000)[4]), and in sentencing an individual to an extended term (730 ILCS 5/5—5—3.2(b)(11) (West 2000)[5]) and, according to respondents, at any later proceeding, the court can look to the previous trial record to ascertain the specific underlying offenses.

Initially, we agree with respondents that the trial court's finding, that the State proved the elements of the offense of armed robbery based on the taking of Fernandez's car, was erroneous. Section 18—1 of the Criminal Code of 1961 clearly exempts the taking of a motor

---

[2]While this is correct, respondents ignore the legislature's language in these definitions that it was its intent that the terms were synonymous with how they were defined and used in the previous Juvenile Court Act of 1987. 705 ILCS 405/5—105(13), (17) (West 2000).

[3]This section provides that evidence and adjudications in proceedings under the Juvenile Court Act are admissible in subsequent criminal proceedings when the court is setting bail, determining fitness, and imposing a sentence.

[4]This section provides that "a history of prior delinquency or criminal activity" shall be accorded weight when the trial court is sentencing a defendant.

[5]This section provides that an extended-term sentence may be imposed upon a defendant who has previously been adjudicated a delinquent under the Juvenile Court Act where the offense would have been, if committed by an adult, a Class X or Class 1 felony.

vehicle from the definition of armed robbery. 720 ILCS 5/18—1 (West 2000). As such, there is no such offense and the State incorrectly charged respondents with same and the trial court erroneously found the State had proven same, *i.e.*, respondents were charged with and found to have committed a nonexistent offense. Since one cannot be found to have committed an offense that does not exist, we therefore vacate the trial court's finding in this regard.

Additionally, we note that, contrary to the State's argument, respondents are not required to raise an issue in a postadjudication motion to preserve that issue for review. *In re W.C.*, 167 Ill. 2d 307, 327, 657 N.E.2d 908 (1995). However, we also note that respondents did not raise this issue in the trial court. Thus, the question is whether it should be reviewed as plain error.

The plain error doctrine allows a reviewing court to consider a trial error, which has been defaulted because it was not properly preserved, under two limited circumstances: " '(1) [where] the evidence in a criminal case is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial.' " *People v. Harvey*, 211 Ill. 2d 368, 387, 813 N.E.2d 181 (2004), quoting *People v. Byron*, 164 Ill. 2d 279, 293 (1995). The plain error rule is a very narrow exception to the forfeiture rule.

We decline to address respondents' claim under the plain error doctrine. First, the evidence is not closely balanced. Second, there has been no substantial prejudice to respondents. In this regard, we note that respondents have not identified what substantial right is involved that was prejudiced with respect to the application of the plain error doctrine. They simply conclude, citing two cases, that we should review this claim under the plain error rule. It is true that the cases relied upon by respondents have reviewed one-act, one-crime and lesser-included-offense claims under the plain error doctrine. However, in those cases and their predecessors and progeny, the basis for finding that a substantial right had been affected was the fact that *improper or unauthorized multiple sentences* had been imposed, warranting the application of the rule. *People v. Hicks*, 181 Ill. 2d 541, 545, 693 N.E.2d 373 (1998) ("The imposition of an unauthorized sentence affects substantial rights"). See also *Harvey*, 211 Ill. 2d at 389 (a violation of the one-act, one-crime rule with potential for surplus convictions and sentences affects the integrity of judicial proceedings warranting application of the plain error doctrine); *People v. Dryden*, 349 Ill. App. 3d 115, 125, 811 N.E.2d 302 (2004) (same as *Hicks*); *People v. Moshier*, 312 Ill. App. 3d 879, 881, 728 N.E.2d 822 (2000) (objections to surplus convictions may be reviewed under the plain error doctrine); *People v. Brown*, 197 Ill. App. 3d 907, 918, 557 N.E.2d 199 (1990) (relied upon

by *Hicks*, that imposition of an unauthorized sentence affects substantial rights); *People v. Lowery*, 177 Ill. App. 3d 639, 645, 532 N.E.2d 414 (1988) (relied upon by *Brown*, same as *Brown*, but not a one-act, one-crime or lesser-included-offense situation). In *People v. Davis*, 156 Ill. 2d 149, 619 N.E.2d 750 (1993), relied upon by respondents, the supreme court refused to invoke the plain error doctrine to save a procedurally defaulted lesser-included-offense claim in a postconviction proceeding. *Davis*, 156 Ill. 2d at 159-60. The court, however, did vacate the defendant's multiple conviction, under its supervisory authority, on the basis of future prejudice that could result to the defendant from that improper conviction. *Davis*, 156 Ill. 2d at 160.

In the instant case, respondents do not argue that an unauthorized sentence was imposed and we do not find that any was. As such, the basis for invoking the plain error doctrine with respect to defaulted one-act, one-crime or lesser-included-offense claims is not present. Additionally, with respect to future prejudice concerns noted in *Davis*, we do not find this reason, which appears to be respondents' sole basis for error here, to apply in the instant case for the reasons discussed below.

Even if we were to review this issue, we would not find respondents' argument persuasive. Several cases are instructive. In *In re W.C.*, the dispositional order committing the respondent, based on a finding of delinquency, identified two first degree murders as the basis for the finding, where only one individual had been killed. *In re W.C.*, 167 Ill. 2d at 341. Our supreme court concluded that there was no question the dispositional order was incorrect because the trial court expressly stated the two counts had merged for one finding of delinquency. *In re W.C.*, 167 Ill. 2d at 342. Accordingly, the *In re W.C.* court found that the dispositional order must be modified to reflect that the respondent was committed to prison based on a single offense of first degree murder. *In re W.C.*, 167 Ill. 2d at 343. See also *In re J.C.*, 260 Ill. App. 3d 872, 885, 632 N.E.2d 127 (1994) (where the dispositional order improperly reflected that the respondent was found to be delinquent on two counts of murder, even though there was only one victim, the order had to be amended to reflect only one count).

In *In re N.S.*, 326 Ill. App. 3d 1094, 762 N.E.2d 1143 (2002), relied upon by the State, the respondent minor was charged with committing two counts of attempted aggravated battery, one based on the fact the offense was committed on public property and the other based on the fact she intended to do great bodily harm. *In re N.S.*, 326 Ill. App. 3d at 1095. The trial court concluded that the State had proven both counts and entered a dispositional order, but did not specifically refer to any offense the respondent was found to have committed. *In re*

*N.S.*, 326 Ill. App. 3d at 1095-96. On appeal, the respondent contended that the record must be modified to reflect the fact she was found to have been convicted of only one count because both counts were based on the same conduct. *In re N.S.*, 326 Ill. App. 3d at 1095. The *In re N.S.* court rejected the respondent's argument, finding:

"Irrespective of the fact that the State provided evidence from which the trial court could find proved the allegations of multiple offenses, there is but a single adjudication of delinquency and no resultant prejudice to the minor." *In re N.S.*, 326 Ill. App. 3d at 1096.

The court further stated that "there is only one dispositional order that does not subject the minor to a greater punishment by reason of a finding of multiple offenses." *In re N.S.*, 326 Ill. App. 3d at 1096. Ultimately, the *In re N.S.* court concluded:

"Here, even though the trial court found in the adjudicatory order that multiple allegations of delinquency had been proved by the State, the dispositional order does not refer to any of the charges and avoids the technical error that occurred in *W.C.* The dispositional order in this case does not state that it was imposed on multiple offenses that arose from the same conduct. No modification or correction is needed." *In re N.S.*, 326 Ill. App. 3d at 1096.

Similarly, in *In re Mareno*, 43 Ill. App. 3d 556, 357 N.E.2d 592 (1976), also relied upon by the State, the respondent argued that the trial court erred in finding him delinquent based on two charges— aggravated assault and criminal damage to property—because they resulted from a single act. *In re Mareno*, 43 Ill. App. 3d at 557. Although noting the law was clear that "in criminal cases multiple convictions based upon the same act are improper, and only the conviction and sentence for the most serious offense may stand," the court stated that neither party had discussed whether this rule was applicable to juvenile proceedings. *In re Mareno*, 43 Ill. App. 3d at 557. The *In re Mareno* court found that

"upon the filing of [a] single petition for adjudication of wardship there could be but one finding of delinquency, even though predicated upon multiple offenses which may have arisen out of the same conduct." *In re Mareno*, 43 Ill. App. 3d at 558.

According to the court, the circumstance before it was "not an instance of multiple convictions, but rather a case involving a single finding of delinquency." *In re Mareno*, 43 Ill. App. 3d at 558. As such, the court found no prejudice to the respondent and affirmed the trial court's order. *In re Mareno*, 43 Ill. App. 3d at 558.

Respondents here maintain that *In re Mareno* is outdated law and was decided prior to the amendments to the Juvenile Court Act. Additionally, although *In re N.S.* was decided in 2002, after the amend-

ments, respondents argue that the court failed to address the impact of the amendments and, as such, the case is not controlling. We would not agree. Respondents ignore the fact that at the time of both *In re N.S.* and *In re Mareno*, trial courts were authorized to use juvenile records and adjudications in subsequent proceedings. Specifically, although respondents argue that section 5—150 was added by the recent amendments, respondents ignore the fact that a similar, if not the same, provision has been in effect for at least 20 years. Effective September 8, 1982, the legislature promulgated section 2—10 (Ill. Rev. Stat. 1983, ch. 37, par. 702—10), which contained the same language as section 5—150 and allowed trial courts to consider evidence and proceedings in a juvenile delinquency adjudication in a subsequent proceeding for purposes of bail, fitness, and sentencing, just as the trial courts are still allowed to do. As such, this is not a new rule or a new legislative intent. Additionally, the court itself in *In re Mareno* stated:

> "While the realistic distinction between criminal and juvenile proceedings is not sharply defined [citation], it is clear that a juvenile record may be used in aggravation and mitigation in allowing the trial court to render a proper disposition in subsequent criminal matters ***." *In re Mareno*, 43 Ill. App. 3d at 558.

Likewise, section 5—5—3.2(a)(3), allowing the trial court to consider previous delinquency adjudications in sentencing a defendant, has been in existence since at least 1978. As such, at the time the *In re N.S.* and *In re Mareno* courts reached their conclusion that multiple findings were permissible, the courts were aware that a delinquency finding could subsequently be used against a respondent in a later criminal proceeding for various reasons. Accordingly, we see no reason to find that the holdings of *In re N.S.* and *In re Mareno* are no longer valid. There is no reason to find, based on the amendments, which essentially allow nothing new, that respondents are now prejudiced by multiple findings where only one delinquency adjudication is entered.

Additionally, section 5—605(4)(j) of the Juvenile Court Act, effective 1999, specifically provides that if the delinquency adjudication is to be heard by a jury, rather than at a bench trial, the jury is *required* to return a general verdict as to each charged offense. It simply cannot be proper for a jury to render findings on multiple offenses, yet improper for a trial judge to do the same thing.

Based on the foregoing, we see no basis for departing from the holdings in *In re N.S.* and *In re Mareno* that a trial court is permitted to render multiple findings on separate offenses in concluding that a juvenile is delinquent and that the juvenile does not suffer any prejudice from such findings. As in those cases, in the case *sub judice*,

998

there was a single adjudication of delinquency and a single sentence. Accordingly, even absent forfeiture of the issue, we would decline to modify the trial court's findings as requested by respondents.

CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

WOLFSON and HALL, JJ., concur.