No. 3--04--0451

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2006

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 94--CM--355 |
| BRIAN A. VERCOLIO, | ) ) | Honorable H. Chris Ryan, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE SCHMIDT delivered the opinion of the court:
_____


In 1994, the State petitioned the trial court to find the respondent, Brian A. Vercolio, to be a sexually dangerous person (SDP) (725 ILCS 205/0.01 (West 1994)).  The court adjudged the respondent to be an SDP and ordered him to be civilly committed.

In 2002, the respondent filed an application asking the trial court to find that he was recovered (725 ILCS 205/9 (West 2002)).  At an evidentiary hearing, the court ruled that the proposed testimony of the State's expert witness met the standard for admissibility in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).  At trial, a jury found that the respondent appeared no longer to be dangerous, but that it was impossible to determine with certainty under conditions of institutional care that he was fully recovered (725 ILCS 205/9 (West 2002)).

Accordingly, the court ordered the respondent to be released under 53 enumerated conditions (725 ILCS 205/9 (West 2002)).

On appeal, the respondent argues that the trial court erred by ruling that the expert's proposed testimony met the Frye standard for admissibility because the expert relied on (1) the Minnesota7 Sex Offenders Screening Tool Revised (MnSOST-R) and the Static-99 actuarial risk assessment tools; and (2) 25 variables that the expert had developed for assessing the risk of recidivism among sex offenders. The respondent also contends that seven of the conditions imposed by the court for his release are excessive. We affirm in part and remand with directions.

BACKGROUND

The record shows that the respondent was found to be an SDP because of numerous acts of exhibitionism. On March 27, 2002, the respondent filed his application asking the trial court to find that he was recovered. On that date, the respondent also filed a demand that a sociopsychiatric report be prepared by the Department of Corrections (DOC) (see 725 ILCS 205/9 (West 2002)).

At a hearing on May 31, 2002, the assistant State's Attorney indicated that the report was being prepared for the DOC by Dr. Mark Carich, but that the parties had not yet received copies of it. The respondent's court-appointed attorney stated that when the attorney received the report, he would file a motion requesting a Frye hearing.

The record supplied to this court does not include either a copy of Carich's report or a copy of the respondent's motion for

2

a Frye hearing.  The record, however, includes the transcript of the Frye hearing conducted by the trial court in several proceedings, beginning on September 20, 2002, and ending on April 14, 2003.  Dr. Barry Leavitt testified for the State, and Dr. Terrence Campbell testified for the respondent.

At the beginning of the hearing, the parties agreed to allow Campbell to testify first even though the State had the burden of going forward.  Campbell stated that he had reviewed Carich's report and Leavitt's evaluation of Carich's report.  Campbell also had prepared an evaluation of Carich's report.[1]

Campbell testified that Carich had used 25 variables concerning treatment effectiveness to assess the respondent's risk of sex offense recidivism.  Carich also had employed the MnSOST-R and the Static-99 actuarial risk assessment tools.

Campbell said that he used a 1998 study published by R. Karl Hanson and Monique T. Bussiere to assess Carich's 25 variables. Hanson and Bussiere had "identifi[ed] different risk factors and the extent to which those factors are correlated with previously convicted sexual offenders committing new sexual offenses after they are released from confinement."  Campbell criticized Carich's use of the 1996 version of the Hanson and Bussiere study

---

[1] Neither Leavitt's evaluation nor Campbell's evaluation is included in the record.

3

because it was not subjected to peer review in the literature, but the 1998 version was peer reviewed.

Campbell testified about each of Carich's 25 variables. Concerning most of the variables, Campbell said that there was not a statistically significant correlation between the variables and a risk of recidivism, according to the 1998 Hanson and Bussiere study. Regarding other variables, Campbell stated that there was no support in peer-reviewed journals for using those variables to assess the risk of recidivism. Campbell said that one of Carich's variables combined four of Hanson and Bussiere's risk factors. Campbell asserted that Hanson and Bussiere had advised against combining their risk factors because "the correlations are too small" and "we don't know about the intercorrelations."

Campbell acknowledged that Leavitt's report stated that the Association for the Treatment of Sexual Abuse (ATSA) recognizes the variables used by Carich. Campbell asserted, however, that the ATSA recognized Carich's variables out of self-interest in promoting its professional agenda rather than on the basis of scientific data.

Campbell testified that there were "major shortcomings" with Carich's reliance on the MnSOST-R. Campbell said that the only peer-reviewed article that assessed the MnSOST-R had reported that the MnSOST-R did not realize an acceptable level of predictive accuracy.

Campbell stated that the most comprehensive study of the Static-99 found that it moderately predicted recidivism risk. The study concluded that the Static-99 should not be used by itself to predict the risk of recidivism.

On cross-examination, Campbell said that he specializes in forensic psychology with several subspecialties within that specialty. He treated sex offenders in the past, but does not currently treat sex offenders. Campbell stated that he also does not assess the risk of sex offender recidivism because he does not believe that such assessments are accurate at this time.

Leavitt testified that he was familiar with Campbell's report concerning Carich's report. Leavitt disagreed with Campbell's reliance on the 1998 Hanson and Bussiere study to assess each of Carich's 25 variables individually. Leavitt then discussed each of Carich's 25 variables. He stated that the variables were supported by research in the professional literature and by the use of similar variables in recidivism risk assessment programs in other states.

Leavitt disagreed with Campbell's characterization of the ATSA as a biased, self-interest group. He submitted that the ATSA was a group of specialists who are knowledgeable about the field of sex offender recidivism assessment.

Leavitt said that the MnSOST-R and the Static-99 are actuarial risk assessment tools used by professionals in his field. He asserted that the debate about their use did not concern whether to use them but, rather, how they should be used.

In summary, Leavitt stated that Carich's 25 variables, as well as the MnSOST-R and the Static-99, were accepted within the psychological community.

At the conclusion of the hearing, the trial court ruled that Carich's report met the standard for admissibility under <u>Frye</u>. The matter proceeded to a jury trial. The jury found that the respondent appeared no longer to be sexually dangerous, but that it was impossible to determine with certainty under conditions of institutional care that he was fully recovered.

The trial court then ordered the respondent to be released subject to 53 enumerated conditions. The respondent's motion for a new trial was denied, and he appealed.

ANALYSIS

I. <u>Frye</u>

A. MnSOST-R and Static-99

The respondent submits that the trial court erred by ruling that Carich's use of the MnSOST-R and the Static-99 met the standard for admissibility under <u>Frye</u>.

In <u>In re Commitment of Simons</u>, 213 Ill. 2d 523, 821 N.E.2d 1184 (2004), the Illinois Supreme Court ruled that the MnSOST-R and the Static-99 meet the standard for admissibility under <u>Frye</u>. Therefore, we need not consider this argument further.

B. Carich's 25 Variables

The respondent contends that the trial court erred by ruling that Carich's reliance on 25 variables met the standard for admissibility under <u>Frye</u>.

6

In Illinois, expert testimony is subject to admissibility under the standard first articulated in Frye. Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 767 N.E.2d 314 (2002). Under the Frye standard, scientific evidence is admissible only if the methodology or scientific principle upon which the expert's opinion is based has gained general acceptance in that particular scientific field. Simons, 213 Ill. 2d 523, 821 N.E.2d 1184. General acceptance, in this context, does not mean universal acceptance, acceptance by consensus, or acceptance by a majority of experts in the field. Simons, 213 Ill. 2d 523, 821 N.E.2d 1184. Instead, general acceptance means that the underlying methodology used to generate the expert's opinion is reasonably relied upon by experts in the field. Simons, 213 Ill. 2d 523, 821 N.E.2d 1184. A trial court's ruling concerning whether testimony is admissible under the Frye standard is subject to de novo review. Simons, 213 Ill. 2d 523, 821 N.E.2d 1184.

In this case, Campbell concluded that Carich's 25 variables were not reliable for a variety of reasons. However, he testified that the ATSA recognizes the use of Carich's variables in assessing the risk of sex offender recidivism, even though he disagreed with the ATSA for doing so.

Leavitt also stated that Carich's variables were accepted by the ATSA. He said that similar variables were used by other states in sex offender recidivism risk assessments. Leavitt concluded, therefore, that Carich's variables are generally

7

accepted within the field.  Because the trial court heard testimony that Carich's variables are generally accepted within the field, we cannot say that the trial court erred as a matter of law by ruling that Carich's proposed testimony, based on his report, met the Frye standard for admissibility.

## II. Excessive Conditions

The respondent argues that the trial court imposed seven excessive conditions on his release.

A respondent who has been adjudged to be an SDP may file an application with the trial court to find that he has recovered. 725 ILCS 205/9 (West 2002).  The trial court then holds a hearing on the application.  725 ILCS 205/9 (West 2002).  At the conclusion of the hearing:

"If the court finds that the person appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that such person has fully recovered, the court shall enter an order permitting such person to go at large subject to such conditions *** as *** will adequately protect the public."  725 ILCS 205/9 (West 2002).

We review a trial court's decision concerning the conditional release of an SDP for abuse of discretion.  People v. Rogers, 215 Ill. App. 3d 575, 574 N.E.2d 1374 (1991).  A trial court abuses its discretion only if its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable

person would take the view adopted by the court.  People v. Donoho, 204 Ill. 2d 159, 788 N.E.2d 707 (2003).

In this case, the trial court released the respondent subject to 53 enumerated conditions.  On appeal, the respondent contends that conditions 13, 14, 21, 38, 39, 40, and 43 are excessive.  In conditions 13 and 14, he is required to submit to a polygraph and a phallometric assessment, respectively, "[i]f deemed appropriate by his treatment staff and/or his therapists."  Condition 21 prohibits the respondent to "posses/own [*sic*], review, or use pornography."  Similarly, condition 39 states that the respondent will "[n]either posses [*sic*] nor have under [his] control any material that is pornographic, sexually oriented, or sexually stimulating, or that depicts or alludes to adult sexual activity or depicts minors under the age of 18."

In condition 38, the respondent is prohibited from purchasing, possessing, or having in his body any alcohol or illegal drugs.  Condition 40 states that the respondent will "[n]ot patronize any business providing sexually stimulating or sexually oriented entertainment, nor utilize '900' or adult telephone numbers or any other sex-related telephone numbers."  Condition 43 says that he will "[n]ot possess or have under [his] control certain specified items of contraband related to the incidence of sexual offending including video or still cameras or children's toys."

Specifically, the respondent submits that conditions 13, 14, 21, 38, 39, 40, and 43 are not related to preventing

9

exhibitionism, which was the basis for the respondent being found to be an SDP. Furthermore, the respondent alleges that conditions 21, 39, 40, and 43 are vague because they do not sufficiently define terms such that the respondent is apprised of what conduct is prohibited.

First, we disagree with the respondent's contention that conditions 21, 39, 40, and 43 are vague. The terms in these conditions are sufficiently specific such that a person of ordinary intelligence would know what conduct is prohibited. See People v. Greco, 204 Ill. 2d 400, 790 N.E.2d 846 (2003).

We rule, however, that condition 39 must be amended. As condition 39 is currently drafted, the respondent may "[n]either posses [*sic*] nor have under [his] control any material that *** depicts minors under the age of 18." In other words, the respondent is prohibited from possessing any photographs of minors whatsoever. As examples, he is prohibited from possessing a newspaper that depicts a minor, a photograph of a minor relative, or a picture of himself as a child. We do not believe that the trial court intended such an unreasonable result.

With regard to the respondent's argument that conditions 13, 14, 21, 38, 39, 40, and 43 are not related to preventing exhibitionism, this court is not in a position to determine what conditions are related to preventing exhibitionism. While some conditions might seem onerous, such as the prohibition against possessing a camera, we cannot say that the trial court's conditions are arbitrary, fanciful, or unreasonable, or that no reasonable person

10

would have imposed these conditions.  Therefore, we hold that the trial court did not abuse its discretion by imposing conditions 13, 14, 21, 38, 39, 40, and 43.

We point out that, by statute, the respondent may at any time file another application for the trial court to find that he is recovered.  See 725 ILCS 205/9 (West 2002).  At such time as the respondent reapplies for a recovery finding, the trial court may review the conditions of the respondent's release.

CONCLUSION

For the foregoing reasons, we affirm the order of the La Salle County circuit court finding that Carich's proposed testimony met the standard for admissibility under Frye.  We also affirm the court's judgment releasing the respondent under 53 enumerated conditions.  However, we remand the matter for the circuit court to amend condition 39.

Affirmed in part and remanded with directions.

LYTTON, J., concurs.

McDADE, J., concurs in part and dissents in part.

_____

JUSTICE McDADE concurring in part and dissenting in part:

_____

Brian Vercolio was a flasher who was found to be sexually dangerous even though his offenses were mere misdemeanors that in no way met the statute's definition of or guidelines for sexually dangerous persons. At issue in this case are the mental health instruments used to test his "recovery" and the conditions imposed on his release to an outside treatment residence. The majority has found that (1) the actuarial testing instruments (MnSOST-R and Static-99 ) have been found by the Illinois Supreme Court to meet the admissibility standard of *Frye*, (2) the Carich 25-Variable Test is generally accepted by experts in the relevant field and thus meets the *Frye* standard, and (3) only one of the seven conditions of release challenged by Vercolio is problematic and should be reconsidered. I agree with the first finding and therefore concur with it. I respectfully dissent, however, from the other two findings and for the reasons stated would remand the entire matter to the LaSalle County Circuit Court for reconsideration.

I. *Frye* Challenges to the Testing Instruments

A. MnSOST-R and Static-99

As the majority has pointed out, the Illinois Supreme Court has recently held that the MnSOST-R and the Static-99 actuarial testing instruments meet the "general acceptance" standards for admissibility under *Frye*. *In re Commitment of Simons,* 213 Ill. 2d 523, 821 N.E.2d 1184 (2004). The respondent's *Frye* challenge with regard to those instruments has been rendered moot by *Simons*, and I concur with the majority's decision in that regard.

12

The *Simons* court, in its holding, found that these testing instruments were generally accepted testing methodologies and could appropriately be admitted in court proceedings without additional validation.  The court did not, however, hold that their use was warranted or relevant in all cases.   In the 2002 jury trial on Vercolio's 1998 Application Showing Recovery, Dr. Ijaz Jatala, psychiatrist for the Sexually Dangerous Persons Program at Big Muddy, and Dr. Mark Carich, the "psychologist" for that program, both testified that the Minnesota Sex Offender Screening Tool, which showed Vercolio at high risk for re-offending, was *not geared for testing exhibitionists*.  Although the test was admissible at Vercolio's trial under *Frye,* I think this issue should be remanded for a determination of its applicability to the specific question of whether Vercolio is likely to recommit the public nuisance misdemeanor of indecent exposure (flashing).

B.   Carich's 25 Variables

I cannot agree with the majority that a showing that the acceptance of Carich's 25 variables by a single group and the use of some but not all of the variables by others satisfies *Frye's* requirement that the particular methodology has gained general acceptance in the field.  I therefore respectfully dissent from that conclusion.

As *Simons* makes clear, our standard for reviewing *Frye* determinations is no longer abuse of discretion; our review is *de novo.*

As the majority points out, *Simons* makes clear that general acceptance does not mean universal acceptance, acceptance by consensus, or acceptance by a majority of experts in the field.

Rather the test is whether the methodology is relied upon by experts in the field and whether that reliance is reasonable. 213 Ill. 2d at 530.

In the present case, both the trial court and the majority appear to rest the decision that Carich's 25 variables are generally accepted in the field on the fact that Dr. Leavitt and Dr. Campbell agreed that Carich's actual test has been utilized by the Association for the Treatment of Sexual Abuse (ATSA). That testimony does establish that the variables are relied upon by some experts in the field. Dr. Leavitt also testified that some of the variables, but not the test itself, are used by other experts. The testimony of neither man establishes that the acceptance is general or that the reliance is reasonable.

Justice Thomas, writing for the *Simons* majority, has told us that we should undertake a *de novo* review of "general acceptance" rulings pursuant to *Frye* because "'"[t]he question of general acceptance of a scientific technique, while referring to only one of the criteria for admissibility of expert testimony, in another sense transcends that particular inquiry, for, in attempting to establish such general acceptance for purposes of the case at hand, the proponent will also be asking the court to establish the law of the jurisdiction for future cases."'" *Simons*, 213 Ill. 2d at 531, quoting, *[People v.] Miller*, 173 Ill. 2d at 204 (McMorrow, J., concurring), quoting *Jones v. United States,* 548 A.2d 35, 40 (D.C. App. 1988). Justice Thomas has also, by his own thorough review, demonstrated for us the kind of analysis that should be undertaken in a *de novo* review

of the general acceptance and consequent admissibility of a scientific methodology. The review undertaken by the majority considers only (1) that the ATSA uses Carich's 25 variables and (2) an uncritical recitation of Dr. Leavitt's endorsement of the variables while apparently discounting Dr. Campbell's criticism because "[h]e treated sex offenders in the past, but does not currently treat sex offenders....he also does not assess the risk of sex offender recidivism because he does not believe that such assessments are accurate at this time." Slip opinion at page 5.

Dr. Campbell testified and asserted in both of his reports that, because of his reliance on questionable methodologies and his improper combination of certain specified factors, Carich's use of his variables "creates an alarming risk of misinforming and misleading any legal proceeding considering Mr. Coop's recidivism risk." While one of his claims has clearly been rendered moot by the decision in *Simons,* not all of them have.

The supreme court observed in *Donaldson v. CIPS Co.,* 199 Ill. 2d 63 (2002):

"Simply stated, general acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of experts. A technique, however, is not 'generally accepted' if it is experimental or of dubious validity. Thus, the *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid."

*Donaldson,* 199 Ill. 2d at 78.

15

That is the question we are called upon to address and resolve through our *de novo* review of Carich's 25 variables.

Because I see no indication that either the trial court or the majority undertook such a review and analysis and because our decision on this matter establishes general acceptance of these variables as "the law of the jurisdiction for future cases" (*Miller,* 173 Ill. 2d at 204 (McMorrow, J., concurring), quoting *Jones v. United States,* 548 A.2d 35, 40 (D.C. App. 1988), and because our decision on this matter significantly impacts future determinations on the recovery and possible permanent incarceration of persons found sexually dangerous; I am compelled to dissent from the affirmance of the trial court's decision as being without error.

In Vercolio's prior recovery proceeding, the test devised by Dr. Carich was comprised of only 15 factors. As with the Minnesota Sex Offender Screening Tool discussed above, Dr. Jatala and Dr. Carich both testified that the 15-factor version of the test was not geared for the exhibitionist. Even if the test was properly admitted under *Frye*, I could find nothing to indicate that the additional 10 factors rendered the test applicable to exhibitionists.

Accordingly, I would, at the very least, remand the case for a hearing on the applicability of the instruments to respondent's particular type of offenses and on the validity of any findings made pursuant to their use in Vercolio's case.

II. Challenged Conditions of Release

Even though, based on the statute's definition, Vercolio is not and never has been sexually dangerous, he has been incarcerated in the Department of Corrections for 12 years for a crime punishable by *up to* 365 days. Although the testimony of the

16

mental health experts at trial was that he has not committed an exhibitionist act during the past four or five years of his incarceration, the opinion of those same experts, grounded in the tests discussed above, denied him a finding of complete recovery. The trial judge is to be commended for not wholly accepting Dr. Carich's assessment that Vercolio is "still" sexually dangerous and for allowing him the opportunity for conditional release.

Pursuant to the plan submitted by the State, Vercolio's release from Big Muddy is predicated on his perfect compliance with 53 conditions.[2] Upon the "technical violation" of any of these conditions, his discharge can be revoked and he can be returned to prison. Condition #3 warns him that "[s]uch technical violations include *but are not limited to* the terms contained on attachment 'A' (the Certificate of Compliance stating the 53 conditions) or the Rules and Regulations of 'Chap House/Jessie House/Upper room Participants' attached as Attachment 'B'." (Emphasis added.) It thus appears that the State has constructed 78 specific conditions and an unspecified number of potential additional conditions of an unspecified nature, any one of which can trip up respondent and send him back to prison. Viewed in this context, his concern with such traps for the

[2]Conditions 2 and 51 incorporate as additional conditions the 25 rules and regulations of his residence during the term of his conditional release, bringing the total to at least 78. This does not include the requirements of the Illinois Sex Offender Registration Act (#49) or all other special conditions that the IDOC and its parole unit may impose (#50).

17

unwary as conditions unrelated to his type of crime and conditions that prohibit conduct that is vague or undefined can be readily understood.

The purpose of conditional release is to determine whether the respondent can refrain, outside of institutional confines, from re-engaging in the conduct for which he has been incarcerated or, in other words, whether he has been cured. The statute also charges the court with imposing conditions that will adequately protect the public. 725 ILCS 205/9 (West 2002). It seems to me that a necessary element in a system for fulfilling this dual purpose is the development and imposition of conditions related to a respondent's particular crime, not a compilation of generic conditions applicable to anyone conditionally released from the Department of Corrections..

Vercolio complains specifically about conditions 13, 14, 21, 38, 39, 40 and 43. The majority declines to invalidate any but one (#39) of the challenged conditions.

As mentioned earlier, Vercolio was an exhibitionist -- a flasher. There is no evidence that he abused alcohol or drugs and, indeed, he denies any such conduct. Nor is there evidence that he used a home computer, camera, telephone, post office box, family pictures or children's toys in the commission of his particular type of crime. I agree with the majority that this court is not in a position to determine what conditions are related to preventing exhibitionism. We can, however, say that some of them clearly appear to be unrelated and can remand for an additional assessment by the court focused on that particular question.

With regard to respondent's claim of vagueness, I think there is merit in his objections. No. 21 prohibits his possession, review or use of "pornography in any

18

fashion (written, printed stories or pictures, photographs, internet sites, telephone services, etc.)"  The paragraph concludes: "This would include any materials depicting adults, adolescents, or children by the above listed means."  This appears to me to be so broad and so ambiguous that one could inadvertently violate the condition without any intent to transgress.

Paragraph 39 prohibits possession of any material that, *inter alia*, is "sexually stimulating" or "alludes to adult sexual activity..."   Almost any book or movie available for non-deviant adult consumption on the market today would violate one or both of those proscriptions.  Similarly paragraph 40 would appear to prohibit respondent from patronizing book stores, libraries, video stores, or other businesses which sell books and movies as part of a broader inventory -- such as WalMart or Target.  Finally, paragraph 43 bars possession of "contraband related to the incidence of sexual offending."  For Vercolio, the only item relating to the incidence of *his* sexual offending is his own sexual apparatus.  One could legitimately question whether he could reasonably be expected to even know all of the items of contraband that might be comprehended within the proscription.  Moreover, it is unstated and therefore unclear where "certain ... items" are actually "specified."

Requiring further evaluation of the appropriateness of the conditions by the trial court seems quite reasonable to me since I would, for the reasons previously stated, remand the case for further consideration on the *Frye* issues in any event.

19