SECOND DIVISION
Date Filed: September 29, 2006


No. 1-05-1554


| | |
|---|---|
| <u>In re</u> DARREN M., a Minor | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of | ) Cook County. |
| Illinois, | ) |
| | ) No. 03 JD 06066 |
| Petitioner-Appellee, | ) |
| | ) |
| v. | ) Honorable |
| | ) Terrence V. Sharkey, |
| Darren M., | ) Judge Presiding. |
| | ) |
| Respondent-Appellant). | ) |


JUSTICE HALL delivered the opinion of the court:

The respondent, Darren M., was charged in a delinquency petition with attempted criminal sexual assault, criminal sexual abuse and aggravated battery. Following a hearing, the respondent was adjudicated a delinquent minor and sentenced to the Department of Corrections, Juvenile Division, for a period of seven years or until his twenty-first birthday, whichever occurred first.

The respondent appeals, raising the following issues: (1) whether his adjudication and sentence are void because the respondent's father was never given notice of the proceedings; (2) whether the circuit erred in denying the respondent's motion to strike the juvenile sex offender evaluation recommendations; (3) whether the <u>Frye</u> standard (<u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923)), governing the admission of scientific evidence, should be replaced by the standard announced in <u>Daubert v. Merrell</u>

Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); and (4) whether the respondent's sentence is excessive.

The respondent does not challenge his adjudication as a delinquent minor. However, because the respondent raises an excessive-sentence issue, we will set forth the facts pertinent to that issue.

The victim, K.B. was 14 years old at the time of the incident.  She met the 15-year-old respondent while playing basketball.  Later, they took a walk together.  When respondent asked K.B. if there was anything going on between them, K.B. told him no, that she had a boyfriend.  The respondent promised her jewelry and clothes or whatever else she wanted, but K.B. told him she was not interested.  When K.B. told the respondent that she had go home, the respondent grabbed her.  When K.B. tried to free herself, the respondent told her to shut up and that he had a gun and would kill her if she did not stop screaming.  K.B. stopped screaming, whereupon the respondent dragged her behind a Dumpster.  When K.B. tried to escape, the respondent pulled her shirt off and threw her against the Dumpster.  When K.B. got up, the respondent pushed her into a stairwell.  K.B. fell backwards and sustained numerous scratches.  The respondent repeatedly told K.B. that he had a gun.  He pulled down K.B.'s pants and underwear and took his penis out of his pants.  When K.B. tried to kick the respondent, he threatened her with a rock.  When the respondent put the rock down, K.B. threw it away.

While K.B. was on her back, the respondent tried to open her legs.  The respondent was about a foot in front of her, facing her, and his penis was erect.  K.B. continued to

struggle while the respondent attempted to assault her.  The respondent then seemed to give up and struck K.B. in her left eye with his right fist, causing blood to gush from her nose.  The respondent told K.B. to put her "fucking" pants back on.  He then took off running.  K.B. sought help from a passing motorist who drove her home.

Following the adjudication of delinquency, the trial court ordered a sex offender evaluation and a social investigation.  Following the completion of the sex offender evaluation, the respondent moved to strike the evaluation recommendations.  The respondent maintained that the tests utilized were not valid predictors of sexual offense recidivism and demonstrated no statistical reliability or predictive validity.

The respondent's sentencing hearing and the hearing on the motion to strike were held on May 6, 2005.  By agreement of the parties, the mitigation evidence was presented first.

Bishop Larry Trotter is the International Presiding Bishop of the United Pentecostal Churches of Christ and pastor of Sweet Holy Spirit Church, attended by the respondent's family.  Bishop Trotter had more contact with the respondent when he was younger, but he is in contact with the respondent's family and sees him in passing.  No one has ever complained to him of the respondent's behavior.  Bishop Trotter observed that the respondent had some mental challenges and was slow to catch on to things, but he had grown up to be a fine young man.  Bishop Trotter had several letters from other pastors and a church member asking for leniency and expressing a willingness to help the respondent.

Pastor James Dukes is the pastor of the Liberation Christian Center and has known

the respondent's family for eight years.  As part of his ministry, Pastor Dukes is involved in Brothers Hiring Brothers, providing mentoring and reentry programs for ex-offenders.  The program could provide services for the respondent and would work in conjunction with the programs available through Bishop Trotter's church.  The respondent had been an active participant in the program since he was 12 years old.

Juanita Cannon, a probation officer, conducted the social investigation of the respondent.  The respondent had been in custody for a year prior to being released on home confinement. During that time, there was no indication that the respondent had been sexually inappropriate or violent.  The respondent had fairly poor grades in school and was suspended at least once for using profanity.  The respondent was very forthcoming about his use of drugs and alcohol.  Ms. Cannon was unfamiliar with any of the programs run by Bishop Trotter.  While the programs referred to in the letters might be worthwhile, they would not influence her recommendation.  At the time she authored her report, she made no recommendation because she was uncertain as to what services the respondent would require.  At the time of the sentencing hearing, she still had no recommendation.

Christine Vitale is a juvenile probation officer, working in the juvenile sex offender unit.  She conducts sex offender evaluations for the court and makes treatment evaluations.  She has a master's degree in social work and a bachelor's degree in science rehabilitation education from the University of Pennsylvania.  She has been a licensed clinical social worker since 1999.  After questioning by both parties, the trial court found Ms. Vitale qualified as an expert witness in juvenile sex offender

evaluations.

Ms. Vitale conducted a clinical interview with the respondent. She had been provided with the petition, police reports, clinical evaluations[1] and the victim's testimony. The interview was conducted over a period of days. The respondent was alert, cooperative and focused during the interview. At the completion of the interview, Ms. Vitale prepared an evaluation report utilizing the "Juvenile Sex Offender Assessment Protocol" or "J-SOAP-II."

Ms. Vitale explained that the J-SOAP-II is a risk assessment for juvenile sex offenders to be used as a guide to aid the clinician in assessing for risk, both for sex offending behavior and criminal behavior. The guide was not the sole basis for Ms. Vitale's recommendation in this case; she used it as an aide in determining the risk of recidivism. The guide is generally accepted in the clinical community and is considered one of the best methods available. It is empirically guided, meaning that the risk factors are found in the professional literature as well as in the research being done on juvenile sex offenders. The assessments were helpful to Ms. Vitale in making her recommendation.

---

[1] The respondent had been evaluated for fitness prior to the delinquency hearing in this case.

After completing the interview with the respondent and collecting the collateral information, Ms. Vitale proceeded to score the J-SOAP-II. The guide is divided into sections that are scored between one and two depending on the information. The respondent exhibited the following risk factors for recidivism: deviant sexual arousal and the fact that his victim was a stranger. Ms. Vitale also considered the violent nature of the attack on K.B. Other risk factors exhibited by the respondent were a history of delinquency, substance use and a recent instance of aggressive behavior toward a female teacher while detained at the detention center. The respondent also exhibited a lack of empathy for the victim and denied responsibility for the attack. The respondent blamed others and had difficulty in managing his anger. There was also evidence that the respondent was sexually promiscuous; he admitted to having 20 sexual partners and to having contracted gonorrhea.

In addition to the J-SOAP-II, in arriving at her recommendation, Ms. Vitale relied on other factors such as her clinical interviews with the respondent and his family, the victim's testimony and the police reports, as well as the risk factors she previously identified. Ms. Vitale recommended that the respondent be sentenced to juvenile-sex-offender-specific treatment in the Department of Corrections.

On cross-examination, Ms. Vitale acknowledged that the J-Soap-II manual makes recommendations as to inpatient or outpatient treatment based on the scores. There are no cutoff scores; the evaluator has to use clinical judgment. According to the manual, the scores may be underestimates because there was only so much information that could be gathered during the evaluation. Ms. Vitale further

6

acknowledged using a rape scale guide even though she was unfamiliar with the book from which the guide came.

Based on the multiple risk factors exhibited by the respondent, Ms. Vitale concluded that he needed a highly structured and supervised setting where he could receive intensive sex offender treatment. She acknowledged that other than the incident in this case, there were no other instances of deviant sexual arousal and that most adolescent offenders' victims are under the age of six. Ms. Vitale further acknowledged that the recidivism rate for juvenile sex offenders is much less than other sex offenders, the difference being receiving treatment. Such treatment could be done on an outpatient basis. She was aware that the sex offender program was located in Kewanee, Illinois, but she was unfamiliar with the program itself.

Ms. Vitale was unaware of whether the respondent's version of the events in this case had any support in the record since she was only given the victim's testimony. Even if the respondent had counseling and support from individuals who worked with sex offenders available to him, she felt it was insufficient. Denial of the incident by the respondent's family as well as people in his community was a detriment to the respondent's ever coming out of denial. However, Ms. Vitale denied that the respondent's refusal to accept responsibility was the primary basis for her recommendation.

On redirect examination, Ms. Vitale explained that the respondent's mother blamed the police for mishandling the case, accused the State of wrongdoing and considered the case a "race thing."

7

The trial court denied the motion to strike the J-SOAP-II. The court noted that, while it would take into consideration the information offered by the State, it would determine the weight to be given to that information. The court indicated that while it believed the information to be beneficial, it was up to the court to decide whether to use the information or not. In aggravation, the State presented a victim impact statement from K.B.'s mother.

In closing argument, the State pointed out that the respondent had been enrolled in the programs offered by the community prior to the offenses in this case. The respondent also used marijuana while this case was pending, indicating that he was not taking these proceedings seriously. Finally, the respondent had robbery and possession of a stolen vehicle charges pending. In response, the respondent pointed out his mother's acknowledgment that, due to a problematic pregnancy, she had made the respondent's home life difficult, causing him to run away and to be become involved in criminal activity. Given the community resources available and his lack of other sexually deviant conduct, the respondent argued that probation with mandatory treatment would be the appropriate disposition. The respondent denied committing the offenses in this case, but requested a chance to make a change in his life.

In rendering its decision, the trial court stated that it was not giving much weight to the fact that the respondent denied his guilt. After reiterating that it found that the respondent had committed the offenses in this case beyond a reasonable doubt, the court stated as follows:

"Weighing in the treatment, violent nature of this attack, the sexual nature of

8

this attack, that there was no prior warning of an attack, and the fact that the minor was really at the time of this alleged incident, I believe [,] out of control of the family situation.  Part of that maybe [sic] and moms are typical and [the respondent's mother] is a typical mom.  She wants to defend the kids at all costs, but at some point Darren has to step up and accept responsible [sic] for his actions.  You can't take blame mother, because you had a bad pregnancy.  And part of the responsibility was you might have been giving him a hard time.  He's a young man and he knows the difference between right and wrong."

While the trial court was impressed with the appearance of Bishop Trotter and Pastor Dukes on the respondent's behalf, it concluded as follows:

"But the fact is it concerns me that the minor might be out of control.  And if I were to give him probation and send him home, I'm not convinced that I would sleep safely at home knowing I don't think I did everything that was really not only in the interest of society, which is a balancing test I have to do.  I have to weigh society's issues and concerns and the minor's.  What I have to do with the minor in his well-being and what I think is in his best interest."

The trial court sentenced the respondent to the Department of Corrections for a period of seven years or until his twenty-first birthday, whichever event occurred first. The court explained that the juvenile court justice division had set up a treatment program at Kewanee, monitored by Cook County probation officers.  If the probation officer determines that a minor has been helped by the program, the minor can be transferred back to Cook County and receive outpatient services, monitored by the

9

court. The court entered and continued a motion to vacate the Department of Corrections sentence. If the respondent did well at Kewanee, he could be brought back and receive outpatient services.

This timely appeal followed.

ANALYSIS

I. Jurisdiction

The respondent contends that the failure to serve his father with notice of the juvenile proceedings in this case deprived the trial court of jurisdiction. The State responds that the respondent has waived this issue by failing to raise it in the trial court.

The delinquency petition in this case named the respondent's mother and father as respondents. The father's address was listed as unknown. At the initial court appearance in this case, the respondent, his mother and his stepfather appeared in court. After ascertaining the identify and correct address of the mother, the following colloquy occurred:

"MS. LEUIN (assistant State's Attorney): What is the minor's biological father's name?

THE MOTHER: Darren [M.].

MS. LEUIN: Do you know where Mr. [M.] lives?

THE MOTHER: I don't know the address, but I know where he lives.

MS. LEUIN: Does he see or talks to his son on a regular basis?

THE MOTHER: This is his father.

THE COURT: Does he pay child support?

10

THE MOTHER: No.

THE COURT: No contact father."

"[A] minor and his or her parents have a constitutional right of due process to receive adequate notice of a juvenile proceeding." In re C.R.H., 163 Ill. 2d 263, 269, 644 N.E.2d 1153 (1994). Unless a claim of inadequate service of notice can be deemed waived, a circuit court's orders adjudicating a minor delinquent and sentencing the minor to the Department of Corrections are void for lack of jurisdiction. C.R.H., 163 Ill. 2d at 272.

The respondent relies on C.R.H. In that case, the court found a due process violation where neither the custodial mother nor the father was served with notice of the proceedings. However, the court recognized that notice could be waived. C.R.H., 163 Ill. 2d at 270-71; see In re J.P.J., 109 Ill. 2d 129, 485 N.E.2d 848 (1985) (the noncustodial parent's whereabouts were unknown and the custodial parent received notice); In re J.W., 87 Ill. 2d 56, 429 N.E.2d 501 (1981) (permitting service by publication where the father's whereabouts were unknown, and there was service on the custodial mother); compare People v. R.S., 104 Ill. 2d 1, 470 N.E.2d 297 (1984) (the noncustodial mother's address was known and she could have been served notice without difficulty).

Recently, this court found the issue as to lack of notice to a noncustodial father forfeited. In In re Ricardo A., 356 Ill. App. 3d 980, 827 N.E.2d 894 (2005), the minor advised the trial court that he had been in contact with his noncustodial father the previous year and could contact him at work. Nonetheless, the State failed to utilize

11

that information to serve the father personally and, instead, served him by publication, which was alleged to be defective. This court held that the notice issue was forfeited because the minor, his mother and his attorney failed to object to the State's lack of diligence in serving the father or to the service by publication. Ricardo A., 356 Ill. App. 3d at 988.

In the present case, the respondent points out that his mother knew where his father lived though she did not know the address. Nonetheless, neither the respondent nor his mother objected to the State's failure to serve his father. Therefore, the issue is forfeited. See Ricardo A., 356 Ill. App. 3d at 988; but see In re K.C., 323 Ill. App. 3d 839, 846, 753 N.E.2d 314 (2001) (objection to failure to name and serve a necessary party cannot be waived).

Even if the issue were not forfeited, we would still hold that the lack of notice to the noncustodial father did not violate due process in this case. The respondent notes that the legislature has attempted to fulfill the due process requirement of notice to parents by setting forth precise procedures to be followed in delinquency cases. Section 5-525 of the Juvenile Court Act of 1987 (705 ILCS 405/5-525 (West 2002)) (the Act) requires that summons with a copy of the petition be directed to the minor's parent, guardian or legal custodian and to each person named as a respondent in the petition. 705 ILCS 405/5-525(1)(a) (West 2002). However, section 5-525 further provides that the summons need not be directed "to a parent who does not reside with the minor, does not make regular child support payments *** and has not communicated with the minor on a regular basis." 705 ILCS 405/5-525(1)(a)(ii) (West 2002).

Again, we find Ricardo A. instructive. While finding the notice issue forfeit, this court further concluded that the minor's due process rights were not violated. The court noted that the State had served the mother, who had sole custody, and she was present for all of the proceedings. The court further noted that there was no evidence that the minor and his father had a significant relationship warranting service on the father. The minor had been in contact with his father but did not know where his father lived, and there was no evidence that they maintained regular contact. Also, there was no evidence as to what assistance or protection the minor's father could have provided him had he been present during the proceedings. The court observed as follows:

> "'Unless a minor shows some significant relationship with a noncustodial parent that is affected by the adjudication, he cannot stand silent at a hearing where he is represented by counsel and where his custodial parent is present and then later be heard to complain about lack of notice.' [Citation.] Respondent here stood silent and failed to demonstrate a significant relationship with his father. As such, we would find, even absent forfeiture of this issue, that he was not denied due process by the State's failure to notify his father of the proceedings. Accordingly, we conclude that the trial court did not lack jurisdiction over this matter and its adjudication need not be vacated as void." Ricardo A., 356 Ill. App. 3d at 989, quoting In re S.W.C., 110 Ill. App. 3d 695, 698-99, 442 N.E.2d 961 (1982).

In the present case, the respondent points out that he informed Ms. Vitale that he had met his father "lots of times" and last had contact with him three years before.

13

Since the statement was made more than a year and a half after his initial court appearance, the respondent argues that he had contact with his father within a year and half of his initial court date. The respondent further argues that since his commitment to the Department of Corrections was due in part to the perception that his mother was unable to control him, he was adversely affected by the failure of the State to serve his father, thus preventing a determination as to what kind of assistance his father could have provided him.

The record fails to establish that the respondent had regular contact with or a significant relationship with his noncustodial father that would require notice to him. In that same interview with Ms. Vitale, when questioned about his relationship with his father, the respondent replied, "'He's a crack-head, he ain't in my life.'" The respondent further asserted, "'I don't care, don't got no feeling'" for his father. The respondent had met his father "'lots of times' and 'didn't like the way he treated me.'" His father would "'buy me stuff and take it back if I didn't listen. He didn't like buying me stuff and didn't keep promises.'" The respondent reported that his father had been arrested for "'stealing something or other.'"

In the present case, the noncustodial father paid no child support. The respondent's custodial parent was served and appeared in court. The respondent's own words belie any type of relationship with his father, let alone a regular or significant one. The description provided by the respondent does not suggest a parent whose involvement in this case was desired either by the respondent or could have provided the respondent with any assistance of a positive nature. Even if the respondent had seen his father

14

within a year and half of his initial court date, that does not establish "regular contact."

The respondent cites a number of cases, all of which are distinguishable. See In re Willie W., 355 Ill. App. 3d 297, 838 N.E.2d 5 (2005) (the lack of notice to custodial father fatal to jurisdiction where the mother supplied the father's telephone number, the father paid child support, and the probation department was able to locate the father's address); In re Miracle C., 344 Ill. App. 3d 1046, 801 N.E.2d 1177 (2003) (the record indicated that the whereabouts of the noncustodial father were known to the State at the time of the adjudication hearing); In re T.B., 65 Ill. App. 3d 903, 382 N.E.2d 1292 (1978) (where mother left the jurisdiction, the State was required to make inquiries of the mother's former neighbors and the respondent-father, if he were available, to fulfill the diligent-inquiry requirement).

Finally, a minor may waive any question regarding the State's diligence in attempting to locate and serve a noncustodial parent. In re Tyrone W., 326 Ill. App. 3d 1047, 1050, 762 N.E.2d 1159 (2002). The respondent's mother stated that she knew where the father lived, but she failed to supply that information to the State. Moreover, the mother denied that the father had regular contact with the respondent and, apparently referring to the stepfather, indicated that he was the respondent's "father." The respondent, who was present, did not contradict his mother's statements. Moreover, the information the respondent supplied to Ms. Vitale regarding his relationship with his natural father was

15

given after the adjudication.[2]

In sum, we determine that the respondent forfeited the notice to the noncustodial father issue. However, even in the absence of forfeiture, the respondent was not denied due process by the State's failure to notify the noncustodial father of these proceedings. We conclude that the trial court did not lack jurisdiction over this matter, and the respondent's adjudication and sentence need not be vacated as void.

## II. Motion to Strike

The respondent contends that the trial court erred when it refused to strike the juvenile sex offender evaluation recommendations. The respondent argues that the J-SOAP-II has not been validated by the scientific community and is unreliable as an assessment tool. In the alternative, the respondent maintains that the trial court should

---

[2]We note with displeasure that the respondent does not attempt to distinguish Ricardo A., a recent case from this district, or to acknowledge its existence, even after it was cited by the State.

16

have conducted a hearing pursuant to Frye to determine the acceptability of the J-SOAP-II.

## A. Standard of Review

A dual standard of review applies with respect to a trial court's admission of expert scientific evidence. In re Commitment of Simons, 213 Ill. 2d 523, 530, 821 N.E.2d 1184 (2004). "The decision as to whether an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case, remains in the sound discretion of the trial court. The trial court's Frye analysis, however, is now subject to de novo review. In conducting such de novo review, the reviewing court may consider not only the trial court record but also, where appropriate, sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions." Simons, 213 Ill. 2d at 530-31.[3]

## B. Discussion

Section 5-705 of the Act requires the trial court to determine the proper disposition based upon the best interests of the minor. 705 ILCS 405/5-705(1) (West 2004). "All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of trial." 705 ILCS 405/5-705(1) (West 2004). The court is

---

[3] The respondent cites In re K.D., No. 04-1165 (October 26, 2005), an unpublished opinion from the Iowa Court of Appeals. While the Iowa appellate rules allow unpublished opinions to be cited, they are not controlling authority. See Iowa Ct. R. 6.14(5). Under our own rules of appellate practice, K.D. may neither be cited nor relied upon as authority. See 166 Ill. 2d R. 23(e).

to advise the parties of the factual contents and conclusions of the reports considered by the court and to afford the parties the opportunity to controvert them. 705 ILCS 405/5-705(2) (West 2004).

"In Illinois, expert testimony is subject to admissibility under the standard first articulated in Frye." People v. Vercolio, 363 Ill. App. 3d 232, 236, 843 N.E.2d 417 (2006). "Under the Frye standard, scientific evidence is admissible only if the methodology or scientific principle upon which the expert's opinion is based has gained general acceptance in that particular scientific field." Vercolio, 363 Ill. App. 3d at 236. General acceptance does not mean universal acceptance but that the underlying methodology used to generate the expert's opinion is reasonably relied on by the experts in the field. Vercolio, 363 Ill. App. 3d at 236.

Prior to Simons, the appellate courts had taken one of two approaches in dealing with actuarial risk assessments. See People v. Taylor, 335 Ill. App. 3d 965, 782 N.E.2d 920 (2002) (actuarial risk assessment was a scientific methodology which the State was required to prove had gained acceptance in the relevant scientific community); but see In re Detention of Erbe, 344 Ill. App. 3d 350, 800 N.E.2d 137 (2003) (actuarial risk assessment was not a novel scientific method subject to Frye and even if it was, it was generally accepted). In Simons, our supreme court agreed with the conclusion in Erbe and held that, whether or not an actuarial risk assessment is subject to Frye, there was no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law. Simons, 213 Ill. 2d at 535. As the court noted, "experts in at least 19 other states rely upon actuarial risk

18

assessment in forming their opinions on sex offenders' risks of recidivism."  Simons, 213 Ill. 2d at 535.

The State argues that the J-SOAP-II is an actuarial scale and therefore not subject to Frye.  However, according to the 2003 J-SOAP-II manual, the J-SOAP-II "is a checklist" to aid in the review of risk factors identified in the professional literature as associated with sexual and criminal offending.  The manual further provides:

"Although our goal is to provide the user with probabilistic estimates of risk for sexual recidivism, we still do not have adequate data on a sufficiently large number of juvenile sexual reoffenders to provide such estimates.  Thus, at the present time, J-SOAP-II is not an actuarial scale.  J-SOAP is an empirically informed guide for the systematic review and assessment of a uniform set of items that may reflect increased risk to reoffend."  (Emphasis in original.)  R. Prentky & S. Righthand, Juvenile Sex Offender Assessement Protocol-II (J-SOAP-II) Manual, at 8 (2003).

Nonetheless, even if the trial court erred in failing to hold a Frye hearing, any error was harmless.  See In re Commitment of Stevens, 345 Ill. App. 3d 1050, 1060-61, 803 N.E.2d 1050 (2004) (any error in failing to conduct a Frye hearing harmless where the evidence established that the actuarial assessment-risk instruments were generally accepted by professionals who assess sex offenders).  In Stevens, the court noted that

19

"'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Stevens, 345 Ill. App. 3d at 1061, quoting Daubert, 509 U.S. at 596, 125 L. Ed. 2d at 484, 113 S. Ct. at 2798.

According to Ms. Vitale, her methods of evaluation, which included but were not limited to the J-SOAP-II, were generally accepted in the community of trained clinicians, including psychologists and psychiatrists, who evaluate juvenile sex offenders. The respondent conducted a vigorous cross-examination of Ms. Vitale in which she acknowledged that the J-SOAP II had not been validated yet.

Finally, even if the respondent had prevailed at a Frye hearing and barred the admission of the J-SOAP-II, we are satisfied that the result in this case would have been the same.

See In re Commitment of Field, 349 Ill. App. 3d 830, 813 N.E.2d 319 (2004) (erroneous admission of actuarial instruments was harmless error where evidence unrelated to those instruments supported the opinions of the State's experts).

In arriving at her recommendation for the respondent, Ms. Vitale used methods including conducting a clinical interview, checking collateral information and using empirical guides that are standard in the clinical community. In determining that the Department of Corrections was the least restrictive environment to provide the respondent with sex-offense specific treatment, Ms. Vitale identified the following risk factors in her report: "the violent nature of the offense, the victim was a stranger, the minor's extensive denial, resistance to treatment, no evidence of remorse or empathy,

his history of nonsexual delinquency, substance use, history of running away, and recent aggression towards a female teacher."

Ms. Vitale testified that these risk factors have been validated by research as showing a propensity to reoffend. She stressed that the J-SOAP-II and the other nonvalidated scales were utilized only as guides. See In re Committment of Lourash, 347 Ill. App. 3d 680, 688, 807 N.E.2d 1269 (2004) (reversal not required where actuarial instruments were not crucial to the expert's conclusion).

We conclude that the J-SOAP-II was not crucial to Ms. Vitale's recommendation regarding the disposition for the respondent and that the recommended disposition was supported by the other evidence in this case. Therefore, any error in the trial court's denial of the respondent's motion to strike was harmless.

The respondent then argues that he should not receive a harsher sentence because he denied committing the offense. The respondent correctly asserts that the imposition of a penalty based upon a defendant's refusal to admit guilt is violative of due process. People v. Carlson, 293 Ill. App. 3d 984, 990, 691 N.E.2d 1156 (1997) (remanded on other grounds). "[I]n determining whether a sentence was improperly imposed, the reviewing court should not focus on a few words or statements of the trial court; it should, rather, consider the complete record in its entirety." Carlson, 293 Ill. App. 3d at 990.

There is no question that the respondent's continual denial that he committed the offenses in this case was a factor in Ms. Vitale's recommendation that he be sentenced to the Department of Corrections. However, as noted above, other risk factors

21

contributed to Ms. Vitale's recommendation in this case. Moreover, the trial court specifically recognized the respondent's right to persist in his claim of innocence for purposes of appeal and noted that it was not giving much weight to the fact that the respondent continued to deny his guilt.  In sentencing the respondent to the Department of Corrections, the trial court noted the circumstances of the attack and that it believed that the respondent could not be controlled by his family.

We conclude that the respondent's sentence to the Department of Corrections was not based solely on his denial of guilt of the offenses in this case.

As an alternative argument, the respondent urges this court to replace the Frye standard with the standard announced in Daubert.   We note, as does the respondent, that Frye is currently the standard in Illinois.  See Simons, 213 Ill. 2d at 529 (in Illinois, the Frye standard governs the admission of expert testimony).  This court is without authority to alter that standard.  See Mekertichian v. Mercedes-Benz U.S.A., L.L.C., 347 Ill. App. 3d 828, 836, 807 N.E.2d 1165 (2004) ("After our supreme court has declared the law with respect to an issue, this court must follow that law, as only the supreme court has authority to overrule or modify its own decisions").

### III.  Excessive Sentence

### A.  Standard of Review

A court's dispositional order will not be overturned on appeal unless it is against the manifest weight of the evidence.  In re R.D.M., 313 Ill. App. 3d 989, 992, 731 N.E.2d 421 (2000).  An order is against the manifest weight of the evidence if the opposite result is clearly apparent.  See In re V.O., 287 Ill. App. 3d 1055, 1058, 679 N.E.2d 1241

(1997).

## B. Discussion

"When determining the appropriate disposition, the circuit court may choose as it sees fit, among the various alternatives, and need not defer to any particular recommendation." In re J.C., 260 Ill. App. 3d 872, 884, 632 N.E.2d 127 (1994). "However, because delinquency proceedings are protective rather than punitive in nature, '[c]ommitment is to be used only when less severe placement alternatives would not be in the best interests of the minor and the public.'" J.C., 260 Ill. App. 3d at 884, quoting In re B.S., 192 Ill. App. 3d 886, 891, 549 N.E.2d 695 (1989).

The respondent contends that the evidence failed to establish that the Department of Corrections was the least restrictive placement for him. He argues that Ms. Vitale's determination, that he required inpatient treatment in the Department of Corrections, was based on faulty risk assessment tools. However, we have already rejected the respondent's argument on that point.

In determining the disposition in this case, the trial court cited the violent and sexual nature of the attack on the victim and the fact that the respondent was beyond the control of his family. Weighing the needs of both the respondent and society, the court determined that probation was not an appropriate sentence.

In V.O., the reviewing court found that the minor's commitment to the Department of Corrections was not against the manifest weight of the evidence where parental efforts to help the minor failed, the social history recommended the commitment, and the minor

23

had committed arson, a serious offense. The reviewing court also found that the trial court properly considered that the minor's commitment was necessary for the protection of the public. V.O., 287 Ill. App. 3d at 1058; see J.C., 260 Ill. App. 3d at 884-85 (the minor's commitment to the Department of Corrections was a valid exercise of the court's discretion where the minor was beyond the control of his parents, and the Department offered counseling and therapy programs to provide the guidance he needed).

The respondent further argues that his sentence was substantially more severe than sentences imposed for more serious crimes. The respondent maintains that he is not making a proportionate penalties argument but merely pointing out that he received a harsher sentence for attempted criminal sexual assault than other juvenile offenders who actually committed the offense, some of whom were given probation.

We have reviewed the cases cited by the respondent. Those cases are distinguishable from the present case, in the lack of violence in the commission of the offense and/or the minor's lack of a criminal history. None of those cases support a sentence of probation in this case, given the violence of the attack on K.B., the respondent's prior criminal history and his need for supervised treatment.

As to the argument that the respondent received more time than an individual convicted of the substantive offense, we note that the length of a sentence for the inchoate crime and the substantive offense can overlap. Section 8-4(c) of the Criminal Code of 1961 provides that "[a] person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted." 720 ILCS 5/8-4(c) (West 2002). Thus, an individual with no prior criminal record and

24

who was convicted of criminal sexual assault where the victim was not otherwise injured could receive the minium sentence. However, an individual with a criminal history and who inflicted injuries on the victim in attempting to commit criminal sexual assault could receive a longer sentence.

Moreover, the reference to seven years in the Department of Corrections commitment order is deceptive. As the respondent acknowledges, his sentence translates to a 4-year sentence since he will be 21 years old in 2009. Attempted criminal sexual assault is punishable as a Class 2 felony for which the sentencing range is 3 to 7 years. Therefore, the respondent's four-year sentence was only one year more than the minimum term of years he could have received as an adult.

Finally, at the sentencing hearing, the trial court stated that the Department of Corrections sentence was stayed. After finding that the minor required incarceration in DOC, the court stated as follows:

"Now, this may catch everyone by surprise, but it's not catching me by surprise. Motion to vacate the DOC order will be entered and continued. The case is going to be transferred to Calendar 50 so that they can monitor this particular case before he goes down to Kewanee. And once he's down at Kewanee, they will continue to monitor him. If he does well down at Kewanee, he can then be brought back. They'll vacate the Department of Corrections and he'll receive outpatient treatment services as a sex offender. That is going to be my order. I don't know whether it's objected to by either party or not, but that's my intent. So, the motion to vacate the Department of Corrections order is

25

entered and continued."[4]

Although at the time the court did not believe that a Department of Corrections commitment order was necessary, it acknowledged that it had not yet had a case proceed in this manner. However, a commitment order was entered on May 16, 2005. Nonetheless, assuming the minor responds to treatment, he will not remain in DOC as long as the commitment order might indicate.

Given the respondent's background, the circumstances of the offense in this case and his need for treatment, the trial court's sentencing order was not against the manifest weight of the evidence.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and SOUTH, JJ., concur.

---

[4] The stay order is reflected in the clerk's minute order.